**ENVIRONMENTAL DEFENSE FUND, INC., Petitioner,**

v.

**Anne M. GORSUCH, Administrator, U.S. Environmental Protection Agency, Respondent,**

**Edison Electric Institute, et al., Intervenors.**

**ENVIRONMENTAL DEFENSE FUND, INC., Petitioner,**

v.

**Anne M. GORSUCH, Administrator, U.S. Environmental Protection Agency, Respondent,**

**Edison Electric Institute, et al., Intervenors.**

**ENVIRONMENTAL DEFENSE FUND, INC., Appellant, Environmental Action, Inc.**

v.

**Gary M. DIETRICH, et al.**

**Nos. 81–2025, 81–2214 and 81–2295.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 1, 1982.

Decided July 26, 1983.

Khristine L. Hall, with whom David J. Lennett, Washington, D.C., was on brief, for Environmental Defense Fund, Inc., petitioner/appellant.

Lee R. Tyner, Atty., Dept. of Justice, Washington, D.C., for E.P.A., respondents/appellees. Donald W. Stever, Jacques Gelin and Nancy S. Bryson, Attys., Dept. of Justice, Washington, D.C., and Mark Greenwood, Atty., E.P.A., were on brief, for E.P.A., respondent/appellee. Patrick J. Cafferty, Jr., and Donald W. Stever, Attys., Dept. of Justice, Washington, D.C., also entered appearances for E.P.A., respondent/appellee.

Toni K. Allen, William R. Weissman and Stanley M. Spracker, Washington, D.C., were on brief, for intervenors Edison Elec. Institute, et al., and appellees Central and South West Corp., et al. Thomas H. Truitt, Washington, D.C., also entered an appear-

ance for intervenors Edison Elec. Institute, et al., and appellees Central and South West Corp., et al.

Before WILKEY and MIKVA, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Senior Circuit Judge FAIRCHILD.

Dissenting opinion filed by Circuit Judge WILKEY.

FAIRCHILD, Senior Circuit Judge.

In each of these consolidated cases petitioner-appellant Environmental Defense Fund ("EDF") challenges the EPA Administrator's decision to defer processing operating permits for existing hazardous waste incinerators and storage impoundments under performance standards called for by the Resource Conservation and Recovery Act ("RCRA" or "the Act"), originally enacted October 21, 1976, Pub.L. 94–580, 90 Stat. 2796, and thereafter amended, principally by the Solid Waste Disposal Act Amendments of 1980, Pub.L. 96–482, 94 Stat. 2334. *See* 42 U.S.C.A. §§ 6901–6987 (1977 & Supp.1981).[1] After a review of the statutory framework of RCRA and the regula-

tions promulgated under its provisions, we conclude that EPA's deferral of the permit process amounted to a suspension of a regulation without notice or comment in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500–576.

## I. BACKGROUND

### A. Statutory and Regulatory Framework of RCRA

RCRA calls on EPA to promulgate a comprehensive set of rules regulating the management of hazardous wastes from "cradle to grave." 47 Fed.Reg. 32275 (1982); 46 Fed.Reg. 2803 (1981). Accordingly, RCRA required the Administrator to promulgate regulations establishing standards for the generation, transportation, treatment, storage, and disposal of hazardous waste within eighteen (18) months of its enactment. *See* 42 U.S.C. §§ 6922–6924. Centrally important to this litigation is Congress' call for regulatory standards under 42 U.S.C. § 6924. Section 6924 requires the Administrator to establish "such performance standards, applicable to owners and operators of facilities for treatment, storage or disposal of hazardous waste ... as may be necessary to protect human health and the environment." [2]

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. For consistency RCRA sections are referred to by their assigned United States Code number.

2. Section 6924 as enacted in 1976 provided in relevant part:

Not later than eighteen months after the date of enactment of this section, and after opportunity for public hearings and after consultation with appropriate Federal and State agencies, the Administrator shall promulgate regulations establishing such performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazardous waste identified or listed under this subtitle, as may be necessary to protect human health and the environment.

42 U.S.C.A. § 6924 (1977). The section was amended in 1980 by adding:

In establishing such standards the Administrator shall, where appropriate, distinguish in such standards between requirements appro-

priate for new facilities and for facilities in existence on the date of promulgation of such regulations.

42 U.S.C.A. § 6924 (Supp.1981). Further provisions of § 6924 specified certain requirements the standards must contain including: (1) maintaining records; (2) satisfactory reporting, monitoring, inspection and compliance; (3) satisfactory treatment, storage or disposal of waste; (4) designation of location, design and construction of facilities; (5) contingency plans; (6) proper maintenance; and (7) compliance with § 6925 requirements. 42 U.S.C. § 6924.

In addition to the mandate of § 6924 and related sections discussed more fully in text, RCRA required EPA to promulgate within eighteen (18) months of its enactment: (1) regulations establishing criteria for identifying and listing hazardous wastes, 42 U.S.C. § 6921; (2) regulations establishing standards for generators of hazardous waste, 42 U.S.C. § 6922; (3) regulations establishing standards for transporters of hazardous waste, 42 U.S.C. § 6923; and (4) guidelines to assist states adopting and

Individual facilities are required to comply with these performance standards through a permit process established pursuant to 42 U.S.C. § 6925. Section 6925 orders the EPA to promulgate a rule requiring every hazardous waste treatment, storage or disposal facility to apply for and secure a permit from the Administrator as a condition of operation.[3] A permit may only be issued if the applicant has complied with disclosure requirements promulgated under § 6925 and performance standards promulgated under § 6924. 42 U.S.C. § 6925(c). Regulations issued under RCRA become effective six (6) months after the date of their promulgation. 42 U.S.C. § 6930(b).

Recognizing that EPA would be unable to review and issue permits to all existing hazardous waste management facilities by

the effective date of the regulations, Congress provided in § 6925(e) that a facility in existence on the date of RCRA's enactment which has given EPA notice of its activities and made application for a permit is to be treated as though it were operating with a valid permit until its permit application is acted upon.[4] 42 U.S.C. § 6925(e)..

As mentioned, RCRA called on the Administrator to promulgate regulations creating a comprehensive federal waste management system within eighteen (18) months of its enactment—not later than April 1978. 42 U.S.C. §§ 6921–6927. EPA did not issue regulations within this statutory time limit. In the fall of 1978 EDF and others brought suits in District Court for the District of Columbia to require the Administrator "to perform his nondiscre-

implementing similar standards and hazardous waste programs, 42 U.S.C. § 6926.

**3.** Section 6925 as amended in 1980 provides in part:

(a) Permit Requirements.—Not later than eighteen months after the date of the enactment of this section, the Administrator shall promulgate regulations requiring each person *owning or operating* a facility for the treatment, storage, or disposal of hazardous waste identified or listed under this subtitle to have a permit issued pursuant to this section. Such regulations shall take effect on the date provided in section 6930 and *upon and after such date* the treatment, storage, or disposal of any such hazardous waste is prohibited except in accordance with such a permit.

(b) Requirements of Permit Application.—Each application for a permit under this section shall contain such information as may be required under regulations promulgated by the Administrator....

(c) Permit Issuance.—Upon a determination by the Administrator (or a State, if applicable), of compliance by a facility for which a permit is applied for under this section with the requirements of this section and section 6924, the Administrator (or the State) shall issue a permit for such facilities. In the event permit applicants propose modification of their facilities, or in the event the Administrator (or the State) determines that modifications are necessary to conform to the requirements under this section and section 6924, the permit shall specify the time allowed to complete the modifications.

(d) Permit Revocation.—Upon a determination by the Administrator (or by a State, in

the case of a State having an authorized hazardous waste program under section 6926) of noncompliance by a facility having a permit under this title with the requirements of this section or section 6924, the Administrator (or State, in the case of a State having an authorized hazardous waste program under section 6926) shall revoke such permit. 42 U.S.C. § 6925.

**4.** Section 6925(e) grants "interim status" to any person who:

(1) owns or operates a facility required to have a permit under this section which facility is in existence on *November 19, 1980,*

(2) has complied with the requirements of section 6930(a), and

(3) has made an application for a permit under this section shall be treated as having been issued such permit until such time as final administrative disposition of such application is made, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required *or requested in order to process the* application.

42 U.S.C.A. § 6925 (1977 & Supp.1981) (emphasis added). (This status was originally extended to facilities in operation on the date of RCRA's enactment: October 21, 1976. "Interim status" was extended to facilities in operation on November 19, 1980 by the 1980 Amendments.) Treatment, storage or disposal facilities in existence on November 19, 1980 are sometimes called "existing hazardous waste management facilities" in EPA regulations and this opinion. *See* 40 C.F.R. § 260.10.

tionary duty to promulgate regulations implementing [RCRA]." *State of Illinois v. Gorsuch,* 530 F.Supp. 337 (D.D.C.1981).[5] *See* 42 U.S.C. § 6972(a)(2) (authorizing "citizen suits" in district court where Administrator failed to perform a non-discretionary duty under RCRA). On January 4, 1979, the district court entered an order setting time limits for the promulgation of the required regulations, including the promulgation of the § 6924 performance standards and the § 6925 permit process for hazardous waste treatment, storage, and disposal facilities.

After numerous postponements, EPA began to comply with the district court's order. EPA did not, however, issue all the regulations called for by RCRA and the court at the same time; rather, the agency issued the regulations in "phases." Promulgation of the first phase of the regulations was substantially completed on May 19, 1980. The "Phase I" regulations established the basic structure for RCRA's system of hazardous waste management. *See* 45 Fed.Reg. 33066–588 (1980) (codified at 40 C.F.R. Parts 122–124, 260–265). Phase I regulations did not, however, establish the technical performance standards for hazardous waste treatment, storage or disposal facilities required by § 6924. EPA indicated at the time that because of the "complexity" of the issues these standards would be issued in "Phase II" of its promulgation process.[6] *Id.* at 33156–57.

The significance of delaying enactment of § 6924 technical standards is reflected in the regulations' two-part permit process. Part A of the application requests basic information about an applicant's hazardous waste management facility including its location, a description of the process used to treat, store or dispose of hazardous waste, and a list of hazardous wastes processed. *See* 40 C.F.R. § 122.24 (1982). EPA indicated this information would provide it with data needed to establish initial priorities in permitting facilities. 45 Fed.Reg. 33290, 33322 (1980). Part B of the application demands far greater detail in order to insure compliance with § 6924 technical requirements promulgated during Phase II. *See* 40 C.F.R. § 122.25 (1982).

Prior to the effectiveness of § 6924 standards, existing waste management facilities were only required to submit a Part A application. Further, during this Phase I period, submission of Part A and compliance with basic notification requirements qualified the facility for interim status, and therefore continued operation, under § 6925(e). 40 C.F.R. § 122.21(c) (1982). A facility continues to enjoy interim status until EPA issues § 6924 performance standards applicable to that facility and EPA calls in Part B applications under the newly promulgated standards. *Id.* Even then, a facility that submits a Part B application will continue in interim status until EPA has taken final action on its application.

For purposes of this litigation it is important to note the distinctly different obligations a facility has under RCRA and its regulations (1) if it has attained interim status, (2) if it has obtained a permit, or (3) if it has accomplished neither (1) nor (2) by failing to submit a Part A or B application when called on to do so.

A facility in the first group is required to comply with interim status standards written to be inexpensive and easily implemented. *See* 45 Fed.Reg. 33154–258 (codified at 40 C.F.R. Part 265). These standards were not intended to be "the final answer to the long-term environmental problems caused by hazardous waste disposal; they really form the outline of the technical standards ... that are to come." *Id.* at 33157. A facility in the second group must comply with § 6924 technical performance stan-

---

**5.** EDF's suit—*EDF v. Dietrich,* No. 78–1715—was consolidated with similar suits before the district court under the name of the earliest filed case, originally *State of Illinois v. Costle.*

**6.** EPA contemplates that even the Phase II § 6924 standards will eventually be revised as the more complex technical issues are better understood and as "specific industries and waste ... require special management standards." 45 Fed.Reg. 33066, 33156 (1980). These revisions are to occur in "Phase III" of EPA's regulatory scheme.

dards.[7] *See* 42 U.S.C. § 6925(c). A facility in the third group must stop operations on the effective date of the regulations requiring a Part A or calling in a Part B permit application. At the end of the first phase of EPA's promulgation of regulations under RCRA no § 6924 technical standards had been promulgated, no final action was possible on permit applications, and hazardous waste management facilities that had submitted a Part A application were free to continue operating so long as they were in compliance with the minimal restrictions of the interim status standards.

## B. Promulgation of § 6924 Standards

After further extensions of time by the court, and opportunity for notice and comment, EPA issued Phase II standards pursuant to § 6924. Among them were performance standards promulgated in January 1981 for the issuance of permits to owners or operators of incinerators[8] and storage surface impoundments.[9] These reg-

ulations, along with others setting standards for tank, pile and container storage facilities, contained effective dates six months later—in July 1981—as required by 42 U.S.C. § 6930(b).[10]

A month before the effective date of these new standards, the Administrator wrote to the Office of Management and Budget ("OMB") concerning EPA's compliance with Executive Order 12291. This executive order, issued February 17, 1981, sought to insure that regulatory action was based on adequate information and a careful balancing of costs and benefits, principally by requiring that regulations be accompanied by a "Regulatory Impact Analysis" ("RIA"). 46 Fed.Reg. 13193–98 (1981). Section 7 of the order directed that regulations which had been published in final form but which had not yet taken effect be suspended pending preparation of an RIA unless (1) the rule cannot legally be postponed or suspended, or (2) good cause is

---

**7.** Once issued, the terms of the permit, not the general § 6924 standards, are actually enforceable against an individual hazardous waste facility. *See* 40 C.F.R. 122.13(a) (1982); 45 C.F.R. 33290, 33311–12 (1980). Nevertheless the terms of each permit are written to insure essential compliance with § 6924 requirements. *See* 42 U.S.C. § 6925; 40 C.F.R. § 122.8 (1982).

Additionally, any facility, regardless of permit status, may be enjoined by the Administrator from engaging in waste management activities that present "an imminent and substantial endangerment to health or the environment." *See* 42 U.S.C. § 6973.

**8.** EPA issued regulations covering "incinerators" on January 23, 1981. 46 Fed.Reg. 7666, 7678 (1981). An "incinerator" is "an enclosed device using controlled flame combustion, the primary purpose of which is to thermally break down hazardous waste. Examples . . . are rotary kiln, fluidized bed, and liquid injection incinerators." 40 C.F.R. § 260.10 (1982). As of April 1981, the EPA estimated 855 such incinerators were in operation in the United States. Memorandum from George Garland, Chief, Economic and Policy Analysis Branch of EPA (dated April 1981), Table II Joint Appendix (J.A.) at 20.

**9.** EPA issued regulations covering "storage surface impoundments" on January 12, 1981. 46 Fed.Reg. 2802, 2868 (1981). A "surface impoundment" or "impoundment" is a natural or man-made depression in the ground used to

hold accumulations of liquid or semi-liquid waste. "Examples . . . are holding, storage, settling and aeration pits, ponds and lagoons." 40 C.F.R. § 260.10 (1982). "Storage surface impoundments" or "storage impoundments" refer to impoundments meant to hold waste materials for a temporary period. *Id.* EPA estimates 1,499 such facilities in operation in the United States as of April 1981. Memorandum from George Garland, *supra* note 8.

**10.** Section 6930(b) provides:

Effective Date of Regulation.—The regulations under this subtitle respecting requirements applicable to the generation, transportation, treatment, storage, or disposal of hazardous waste (including requirements respecting permits for such treatment, storage, or disposal) shall take effect on the date six months after the date of promulgation thereof (or six months after the date of revision in the case of any regulation which is revised after the date required for promulgation thereof).

42 U.S.C. § 6930(b) (1977). The effective date for standards for hazardous waste storage impoundments, tanks, piles and container storage facilities was July 13, 1981; the date for incinerators was July 22, 1981. *See* 40 C.F.R. §§ 264.170–264.258 (1982) (standards for owners and operators of containers, tanks, surface impoundments and piles); 40 C.F.R. §§ 264.-340–264.351 (1982) (standards for owners and operators of incinerators).

shown why the rule ought to become effective without further delay.

In her letter to OMB, the Administrator indicated both exceptions applied to the regulatory standards for hazardous waste tanks, containers, piles and new waste storage impoundments and incinerators. First, the letter noted that a suspension of the permitting standards might be considered a violation of the court order compelling their promulgation and may, in any event, be a violation of the rulemaking requirements of APA.[11] Second, the letter stated that the standards were necessary in order to begin processing permits for needed new facilities and that the regulated community had not objected to their implementation.

The Administrator's letter indicated, however, that the regulated community had raised more substantial objections to the cost and feasibility of applying the performance standards to existing storage impoundments and incinerators. The letter stated that in response to these objections EPA intended to publish a *Federal Register* notice proposing to suspend or withdraw performance standards for permitting existing storage impoundments and incinerators, indicating that it felt an immediate suspension of the standards pursuant to Executive Order 12291 would be subject to legal attack. *See* note 11 *supra*. Additionally, the letter informed OMB of EPA's intent to announce in the *Federal Register* that it would not begin processing permits for existing impoundments or incinerators under the § 6924 standards pending evaluation of their possible suspension.

On July 24, 1981, only a few days after the effective date of the new regulations, EPA issued a notice in the *Federal Register* announcing its intentions and publishing the letter to OMB. 46 Fed.Reg. 38318 (1981). Five months later EPA published a notice of its proposed rule to suspend the effective dates of the performance standards for permitting existing incinerators and storage impoundments. 46 Fed.Reg. 51407 (1981). At that time EPA again announced its policy "not to call in Part B applications for existing incinerators and surface impoundments" pending a final decision on the proposed suspension. *Id.* at 51409. EPA indicated that this policy was prompted by a need to establish priorities in processing the applications of over 15,000 existing and an expected 600 new hazardous waste facilities. This figure included the approximate 2,300 incinerators and storage impoundments involved here. The EPA notice stated that it would not "be a prudent allocation of resources to begin processing permits under standards whose effective date may shortly be suspended." *Id.*

By refusing to call in Part B permit applications for incinerators and storage impoundments, EPA avoided implementing of the § 6924 standards in two important respects. First, EPA's decision relieved the owners and operators of incinerators and storage impoundments from having to begin to develop methods of waste management likely to satisfy the § 6924 standards as a step toward submitting a Part B permit application. Second, EPA's decision indefinitely delayed the time when actual compliance with the § 6924 standards

---

11. The letter observed:

Although the court's order technically only establishes deadlines for the "promulgation" of standards, we believe that any lengthy suspension of their effective date could well be found to constitute non-compliance with the order. This is true for two reasons. First, the six month effective date period under Section [6930](b) is fixed and mandatory, making it, in effect, an element of the promulgation. Second, promulgation of a rule, followed by its long term suspension, may well be considered by the court to constitute evasion of its order.

. . . .

Moreover, suspension of a regulation is considered a rulemaking under the Administrative Procedure Act and requires prior notice and comment unless there is "good cause" for issuing the suspension without it. *Council of the Southern Mountains, Inc. v. Donovan*, [653 F.2d 573 (D.C.Cir.1981)]. The "good cause" exception has been interpreted quite narrowly. *Id.*

46 Fed.Reg. 38318 n. 3, 38319 n. 4 (1981).

would be compelled through final processing of permits.

## C. *The Present Dispute*

In response to EPA's announcements, EDF returned to the district court in *State of Illinois v. Gorsuch,* filing a petition for further relief, arguing that EPA's action (1) put the Administrator in violation of the court's order to promulgate standards and (2) violated EPA's duty under RCRA to give effect to performance standards six months after promulgation.

On November 13, 1981, the district court filed a memorandum and order rejecting both arguments.[12] As to the first, the court concluded that absent a substantial showing that EPA's announcement was a bad faith effort to evade the court's order, the promulgation of the regulations brought the action to a close. As to the second argument, the court found that EPA's suspension of the implementation of a regulation was a matter subject to review exclusively in the court of appeals, *see* 42 U.S.C.A. § 6976(a)(1) (1981 Supp.), and, in any event, presented an issue outside the confines of the litigation before the district court.

EDF brings a direct appeal from the district court's ruling. Although EDF considers the district court the appropriate forum, it filed protective petitions in this court to review the administrator's decision

pursuant to § 6976(a)(1) on the theory that the refusal to process permits amounted in substance to a suspension of the performance standards in violation of RCRA and the rulemaking requirements of APA. The petitions[13] and the appeal of the district court's ruling were consolidated in this court.[14]

## II. MOOTNESS

After oral argument before this court and a year after the decision challenged, EPA issued the following notice with respect to incinerators:

EPA is announcing withdrawal of its proposal to suspend the effective date of the permitting standards for hazardous waste incinerators, as applied to existing facilities, and is ending its policy, announced on October 20, 1981, of postponing requests for Part B permit applications for existing hazardous waste incinerators.

47 Fed.Reg. 27516 (1982). One month later EPA promulgated revised performance standards for surface impoundments entirely superseding the January 1981 standards.[15] 46 Fed.Reg. 32274 (1982). In the same notice, EPA announced that it would immediately begin to request the submission of permit applications from storage surface impoundments described under the

---

12. State of Illinois v. Gorsuch, 530 F.Supp. 337 (D.D.C.1981).

13. EDF actually filed two petitions with this court. No. 81–2025 asks for review of EPA's initial notice on July 24, 1981 of its intention to announce a proposal to suspend performance standards for existing incinerators and storage impoundment. No. 81–2214 asks for review of the actual October 20, 1981 announcement.

14. Central and South West Corporation, *et al.,* were permitted to intervene in the district court and are appellees in EDF's direct appeal from that decision, No. 81–2295. Edison Electric Institute, *et al.,* were granted leave to intervene in EDF's petitions for review to this court, Nos. 81–2025, 81–2214. They submitted a joint brief supporting EPA's position.

15. EPA's notice explained that while the new regulations superseded the January 12, 1981 regulations many of the requirements are consistent. EPA summarized the new regulations' departure from the earlier rules as follows:

[T]oday's regulations apply more broadly and are more flexible than the January 12 regulations. They cover disposal impoundments as well as storage impoundments. Even for impoundments used for storage (or storage and treatment only), more control options are now offered. Whereas the January 12 regulations required double liners, the new standards allow a single liner coupled with ground-water monitoring as an alternative option. And whereas the January 12 regulations required that all hazardous wastes and hazardous waste constituents be removed from the impoundment at closure, the new standards allow as additional options, the decontamination or solidification and stabilization of wastes left in place, covering by a cap, and post-closure monitoring and maintenance.
47 Fed.Reg. 32274, 32318 (1981).

old standards, and now subject to the new regulations. *Id.* at 32318.

▇ EPA suggests that these announcements rendered the present proceedings moot. The agency argues that its actions give EDF the principal relief sought: "namely, the commencement of the permit process for existing incinerators and existing storage surface impoundments." Supplemental Brief for Administrator, at 2 (footnotes omitted). EDF concedes that EPA's actions provide much of the relief it had requested,[16] but contends in opposition that the controversy over the Administrator's authority to suspend the permit process remains justiciable because her action is "capable of repetition, yet evading review." *See Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). We believe that EDF presents the more persuasive argument.

The *Southern Pacific* test for survival of a sufficient controversy to prevent a determination of mootness consists of two elements: "(1) the challenged action [is] in its duration too short to be fully litigated prior

to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). EPA concedes the existence of the first element. This concession appears warranted by the limited duration of the EPA policy at issue: about a year from announcement in the July 24, 1981 *Federal Register* to withdrawal in June and July of 1982. Other EPA deferrals or suspensions of RCRA regulations without notice or comment suggest they are characteristically a year or less in duration.[17] While it is conceivable that a petition to review brought in the future might be expedited, a short-term deferral or suspension similar to the one at issue in this case is likely to evade the court's review even under an accelerated procedure.

The presence of the second prong under *Weinstein v. Bradford*—a reasonable expectation that EDF would be subjected to the same action again—is more uncertain but we think also satisfied here.[18] EPA

---

**16.** EDF's brief in response to EPA's brief on mootness alludes to two other forms of relief not yet satisfied by EPA's actions. EDF suggests that the performance standards for storage surface impoundments were weakened by the revised regulations which superseded them, *see* note 14 *supra;* therefore the possible reinstatement of the old standards remains a justiciable issue. *See Natural Resources Defense Council v. U.S.E.P.A.,* 683 F.2d 752, 759 (3rd Cir.1982). This contention as a possible bar to our declaring the case moot depends on the relief of reinstatement being available to EDF, but EDF does not here contend that EPA's *revision* of the storage surface impoundment standards was contrary either to RCRA or APA. Even if EDF prevails on its challenge to EPA's policy of deferring the permit process pending possible suspension of standards, a court ordered reinstatement of standards now superseded by revised regulations does not appear available.

EDF also points out that its original prayer for relief included a request for "an order preventing EPA from following the unlawful procedure exhibited in this case ever again." While this circuit has suggested a demand for such prospective injunctive relief may prevent a determination of mootness, *see Batterton v. Marshall,* 648 F.2d 694, 699 (D.C.Cir.1980), we find it unnecessary to reach the issue here, finding instead that the case falls within the

"capable of repetition, yet evading review" test. We note that *Batterton* also relied upon this test. *Id.*

**17.** EDF offers three examples of the Agency's short-term postponements of RCRA regulations: (1) the deferral of financial responsibility regulations from October 1, 1981 to April 16, 1982, *see* 47 Fed.Reg. 16544-45 (1982); (2) extension of date for compliance with promulgated regulations prohibiting landfill disposal of containerized liquid waste from February 25, 1982 to March 22, 1982, *see* 47 Fed.Reg. 12316 (1982)—a lawsuit challenging this extension was apparently dismissed when EPA reinstated the prohibition, *Hazardous Waste Treatment Council v. EPA,* No. 82–1207 (D.C.Cir.); and (3) the deferral of three RCRA reporting requirements, *see* 47 Fed.Reg. 7841 (1982)—also the subject of a now dismissed lawsuit, *EDF v. EPA,* No. 82–1346 (D.C.Cir.).

**18.** In *County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), the Supreme Court formulated the corresponding element of the test so as to require a court to conclude "with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur" and to place the burden on the defendant. *Id.* at 631, 99 S.Ct. at 1383 (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629,

argues there is little likelihood the Administrator would again defer the permit process for existing hazardous waste incinerators and storage impoundments. While this assertion may be correct, it supposes too narrow a formulation of EDF"s interest in this litigation and of the nature of this dispute. EDF is a nationally based not-for-profit, public interest corporation formed to promote the protection of human health and the environment. EDF has indicated in its briefs and in its participation in the dispute below and in other litigation,[19] an interest in the promulgation and implementation of regulations under RCRA that extends beyond the permit policy for incinerators and storage impoundments. Because of the breadth of its interest, EDF is likely to be party to any future dispute which involves a similar principle. See Montgomery Environmental Coalition v. Costle, 646 F.2d 568, 578–79 (D.C.Cir.1980); Northern Ohio Lung Ass'n v. E.P.A., 572 F.2d 1143, 1147 (6th Cir.1978).

There is also reason to expect that a similar dispute will arise. The issue in this case is not just whether the EPA will again defer the permit process pursuant to standards for incinerators or storage impoundments but whether it is likely to refuse to call in permits under standards for other hazardous waste facilities or—if we accept EDF"s characterization of EPA's action—to effectively suspend any promulgated RCRA regulation. See Sholly v. United States Nuclear Regulatory Com'n, 651 F.2d 780, 785 (D.C.Cir.1980), vacated and remanded, —— U.S. ——, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983). Under this formulation of the issues, EPA's history of deferrals and suspensions under RCRA,[20] along with its conspicuous failure—in its brief or in announcements related to these or other actions—to foreswear future deferrals without notice or comment, sufficiently show such conduct may reasonably be expected to occur again.[21]

633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). As Judge Wilkey analyzes the matter, in his dissent, the Davis test is appropriate here. Whichever the appropriate formulation, and whosoever the burden, we think that this element has been fulfilled.

**19.** See reference to EDF v. EPA, No. 82–1346 (D.C.Cir.) in note 16 supra. Other suits unrelated to RCRA involving EPA and EDF over the last five years demonstrate the breadth of EDF's interest in protecting the environment. See, e.g., Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275 (D.C.Cir.1981) (challenge to EPA effort to control and abate salinity in Colorado River); Environmental Defense Fund, Inc. v. Environmental Protection Agency, 636 F.2d 1267 (D.C.Cir.1980) (petition to review regulations of chemical substances under Water Pollution Act and Toxic Substances Control Act); Environmental Defense Fund, Inc. v. Costle, 636 F.2d 1229 (D.C.Cir.1980) (suit brought to rectify EPA's alleged failure to implement provisions of Federal Pollution Control Act, including toxic waste provisions); Environmental Defense Fund, Inc. v. Costle, 631 F.2d 922 (D.C.Cir.1980) (review of EPA order restricting use of a miticide under Federal Insecticide, Fungicide, and Rodenticide Act); Alabama Power Co. v. Costle, 636 F.2d 323 (D.C.Cir.1979) (seeking review of EPA's final regulations for preventing significant deterioration of air quality under Clean Air Act Amendments of 1977); Citizens to Save Spencer County v. U.S. Environmental Protection Agency, 600 F.2d 844

(D.C.Cir.1979) (petitions to review EPA orders promulgated under Clean Air Act); Avoyelles Sportmen's League v. Alexander, 473 F.Supp. 525 (W.D.La.1979) (challenge to land-clearing operations under Federal Water Pollution Control Act).

**20.** See note 16 supra. In addition to these examples, EPA lists 36 other instances in the last two years where it has altered RCRA regulations by regulatory amendment, notices of suspension, or notices of extension of compliance deadlines. 47 Fed.Reg. 32274, 32276 (1982). EPA has a history of similar suspensions of effective dates of promulgated regulations under other acts. See Natural Resources Defense Council v. U.S.E.P.A., 683 F.2d 752 (3rd Cir.1982) (postponement of effective date of amendments to regulations under Clean Water Act); Natural Resources Defense Council v. Gorsuch, No. 81–2001 (D.C.Cir.) (stay of regulations defining "source" under Clean Air Act).

**21.** There may be a greater degree of uncertainty about the reasonable likelihood of EPA deferring the permit process under standards promulgated by court order and therefore about the continued justiciability of EDF's assertion that EPA's actions violate that order. Given the scope of the State of Illinois v. Gorsuch litigation (concerned with EPA's duty to promulgate a full range of federal regulations for hazardous waste generation, transportation, treatment storage and disposal pursuant to

## III. APPEAL FROM DISTRICT COURT

The district court took jurisdiction in *State of Illinois v. Gorsuch* pursuant to RCRA's "citizen suit" provision. 42 U.S.C. § 6972. Section 6972(a) permits "any person [to] commence [in district court] a civil action on his own behalf ... against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under [RCRA]." EDF sought to order the Administrator to perform her duty to promulgate performance standards for the generation, transportation, treatment, storage and disposal of hazardous waste as required by the Act. Specifically EDF's complaint asked the court to "enter an order ... directing defendants to comply with the requirements of [RCRA] by promulgating regulations expeditiously" and to "retain jurisdiction of this matter until defendants have promulgated the regulations." As was mentioned, the district court granted this relief, including ordering the promulgation of the regulations at issue here.

EDF argues that EPA's decision not to call in permit applications for existing incinerators and storage impoundments under the 1981 standards violates the district court's order and a non-discretionary duty to give effect to regulations six months after promulgation pursuant to 42 U.S.C. § 6930(b), and that the district court therefore continues to have jurisdiction over the dispute pursuant to the RCRA's "citizen suit" provision.[22] The district court rejected this argument stating:

> This is simply a deadline suit, nothing more. The sole purpose of deadline suits is to bring the equitable powers of the

Court into play to effectuate the declared intentions of Congress.

> EDF requested that the Agency be directed to promulgate regulations, the Court directed the Agency to promulgate regulations, and the Agency has done so. In the absence of a substantial threshold showing that the Agency's subsequent announcement that it would suspend the regulations was a bad-faith effort to evade the Court's Order, the Court is obliged to conclude that the Agency's promulgation of the regulations brought this proceeding to a close as to these two regulations. In responding to an action to enforce explicit statutory deadlines, the Court does not undertake a continuing supervision of the Agency's implementation of its responsibilities after deadlines have been met.

530 F.Supp. at 339.

■ We agree. The district court ordered EPA to promulgate regulations. Black's Law Dictionary (5th ed. 1979) defines the term promulgate as "[t]he formal act of announcing a statute or rule of court." *Id.* at 1093. EPA made a formal announcement in the *Federal Register* of its issuance of the regulations in dispute; at least facially this act appears to satisfy the court's order. Absent evidence that the agency harbored an intent to suspend the regulations at the time of their promulgation,[23] the court properly determined that the act it had commanded had been performed. Indeed, EDF's complaint requested that jurisdiction be retained only until the regulations were promulgated.

EDF nevertheless asserts that implied in the court's order to promulgate the regulations is the command to make them effec-

---

RCRA) and EPA's history of delay in promulgating and implementing regulations under this and other Acts, however, we think this issue is also properly before us.

**22.** As EDF presents them, the arguments intertwine. EDF argues that the district court's order to promulgate regulations necessarily implied that they be given effect within six months as provided by RCRA. But EDF also asserts EPA's "duty" to give effect to regulations six months after promulgation pursuant

to § 6930(b) stands as an independent basis for district court review and reversal of the agency's action.

**23.** EDF urges that the district court should have allowed it the opportunity to establish EPA's bad faith through discovery. The district court thought that absent some threshold showing of bad faith EDF was not entitled to discovery. We find no basis for believing the regulations were promulgated in bad faith and see no reason for further discovery.

tive—or, perhaps, to do nothing to make them ineffective—six (6) months from the date of issuance pursuant to § 6930(b) and the failure to give them practical effect is a violation of the order and EPA's duty under RCRA. This assertion does not comport with the district court's interpretation of its order or the plain meaning of the term promulgate. More importantly, it reads into § 6930(b) an affirmative duty that is not there.

Section 6930(b) states that regulations "applicable to the generation, transportation, treatment, storage, or disposal of hazardous waste (including requirements respecting permits for such treatment, storage, or disposal) shall take effect on the date six months after the date of promulgation ... or six months after the date of [their] revision." 42 U.S.C. § 6930(b). This section puts these regulations into effect upon a date certain by operation of law, and thereby performs an important function. See Natural Resources Defense Council v. U.S.E.P.A., 683 F.2d 752, 762 (3rd Cir.1982) ("without an effective date a rule would be a nullity because it would never require adherence"). But EDF goes too far in asserting that the § 6930(b) language "shall take effect" creates a non-discretionary duty on the part of EPA to perform some additional act to put the regulations into effect. In fact, § 6930(b) expressly provides for the possibility that the effective date may be altered in the event EPA moves to revise the regulations.

The fact that § 6930(b) does not charge EPA with a "duty" to act to give effect to its regulations as promulgated within the meaning of RCRA's "citizen suit" provision does not mean the agency may alter or suspend the effective date of regulations with impunity; it simply means that the

remedy lies in the court of appeals. Section 6976(a)(1) of RCRA, as amended in 1980, provides that "a petition for review of action of the Administrator in promulgating any regulation, or requirement under [RCRA] or denying any petition for the promulgation, amendment or repeal of any regulation ... may be filed *only* in the United States Court of Appeals for the District of Columbia." 42 U.S.C.A. § 6976(a)(1) (Supp.1981) (emphasis added). As we have already suggested and will show, suspension of the permit process as to a class of waste management facilities amounts to a suspension of the effective date of regulation governing that class, and may be reviewed in the court of appeals as the promulgation of a regulation.

The fact that review is within the jurisdiction of this court adds further support to the district court's conclusion that that court lacked jurisdiction. See Oljato Chapter of Navajo Tribe v. Train, 515 F.2d 654 (D.C.Cir.1975). Oljato involved jurisdictional provisions for district court and appellate court review of EPA action under the Clean Air Act which were very similar to those at issue here. The Oljato court emphasized that even if petitioners' claim might have fallen within the language of both the district court and court of appeals provisions, "it is well settled that bifurcated jurisdiction between District Court and Court of Appeals over identical litigation is not favored." Id. at 660. See also Ind. Cosmetic Mfr. v. U.S. Dept. of H.E.W., 574 F.2d 553, 555 n. 2 (D.C.Cir. 1978). We similarly conclude with respect to the matter of jurisdiction that EDF's present claim falls within this court's exclusive jurisdiction pursuant to § 6927 of RCRA, and affirm the district court's refusal of further relief.[24]

---

**24.** Intervenors argue that EPA's decision not to call up permit applications does not constitute promulgation of a final regulation or denial of rulemaking within the meaning of § 6976, and therefore this court lacks jurisdiction. This argument is unpersuasive. First, given the intervenors also contend the district court properly found it lacked jurisdiction over this suit, they bear "the heavy burden of overcoming the strong presumption that Congress did not

mean to prohibit all judicial review of [the agency's] decision." Dunlop v. Bachowski, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); 2 Fed.Proc.L.Ed. § 2:215 (1981). Second, if EDF's characterization of EPA's action is accurate the regulations have been effectively repealed, an act intervenors concede to be final for purposes of § 6976 jurisdiction. Cf. Consumer Energy Council of America v. Federal Energy Regulatory Commission, 673

## IV. PETITIONS FOR REVIEW

In its petitions for review, EDF argues EPA's decision not to call in permit applications for incinerators and storage impoundments under the newly promulgated performance standards amounted in substance to a suspension of a regulation. EDF contends that this suspension is a violation of RCRA, is arbitrary and capricious, and is unlawful in the absence of notice and an opportunity for comment. We address the latter contention first.

"Our review of an agency's procedural compliance with statutory norms is an exacting one." *Natural Resources Defense Council, Inc. v. S.E.C.*, 606 F.2d 1031, 1048 (D.C.Cir.1979). We are concerned here with EPA's compliance with the notice and comment requirements of APA, 5 U.S.C. § 553, in deciding not to call in Part B permit applications under newly promulgated regulations for two classes of hazardous waste facilities. A threshold question is whether EPA's action constitutes a "rule" within the meaning of APA and is subject to its rulemaking requirements.[25]

In order to make this determination, it is important to emphasize again the substantive effect of EPA's decision not to call in Part B applications for existing incinerator and surface storage impoundment facilities under the newly promulgated § 6924 standards. The § 6924 standards at issue were promulgated after substantial delay and opportunity for comment. Absent EPA's decision to defer calling in applications, approximately 2,300 existing hazardous waste management facilities would have been required to submit detailed Part B applications describing their operations and detailing procedures taken to insure compliance with the newly effective § 6924 standards. *See* 40 C.F.R. § 122.25(b)(5) (1982). Failure to submit an application would result in loss of interim status—assuming it was originally attained on submission of a Part A application—and consequently loss of the facility's right to continue operation. As discussed earlier, initiating this permit process would implement standards by forcing facilities to demonstrate substantial compliance with the § 6924 regulations in order to obtain the permit and, once the permit is issued, by requiring compliance with its terms. EPA's decision not to call in Part B applications suspended the implementation process and indefinitely relieved incinerator and storage impoundment facilities from having to comply with the § 6924 technical standards; instead, the facilities were allowed to continue operation under the limited restrictions imposed by interim status standards. Viewed in this light, EPA's decision indefinitely suspended the effective date of the promulgated § 6924 standards for incinerators and surface storage impoundments.[26]

---

F.2d 425, 447–48 (D.C.Cir.1982) (repeal of regulations promulgated under Natural Gas Policy Act of 1978 subject to APA rulemaking requirements). The accuracy of EDF's characterization of EPA's action is considered in the following section of this opinion.

**25.** APA defines both "rule" and "rulemaking" expansively:

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances thereafter or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

5 U.S.C. § 551(4), (5).

**26.** EPA's decision not to call in Part B applications under the new standards, did allow an owner or operator of a facility to voluntarily submit a Part B application asserting substantial compliance with the § 6924 standards. *See* 46 Fed.Reg. 51407, 51408 (1981). For those facilities seeking permits voluntarily, implementation of the § 6924 standards could begin. EPA does not assert, however, that a large number of facilities voluntarily submitted applications under standards the agency itself described as too restrictive and soon to be suspended; nor do we think it likely.

Typically the permit process begins when EPA asks the owner or operator to submit their permit application. *Id.;* 40 C.F.R. 122.22(a)(4). EPA's announcement expressly prevented its

The application of APA rulemaking requirements to an agency action depends on "whether the agency action jeopardizes the rights and interests of parties, for if it does, it must be subject to public comment prior to taking effect." *Batterton v. Marshall,* 648 F.2d 694, 708 (D.C.Cir.1980). EPA's decision not to call in Part B permit applications meets that test and should not have occurred without the benefit of notice or comment by the parties affected, including the general public.

In a case factually similar to the present, the Third Circuit reached a like conclusion. *Natural Resources Defense Council v. U.S. E.P.A.,* 683 F.2d 752 (3rd Cir.1982). In that suit, NRDC sought review of EPA's indefinite deferral of the effective date of a set of amendments promulgated pursuant to the Clean Water Act. The amendments were promulgated in final form on January 28, 1981 with an effective date of March 30. On March 27, in response to Executive Order 12291, the Administrator published a notice postponing the effective date of the regulations indefinitely. After NRDC filed suit, EPA announced its decision to terminate the indefinite postponement and give effect to most of the regulations in dispute. On direct review of this action, the court concluded EPA's indefinite suspension of the effective date of the amendments "fit the definition of 'rule'" under APA. *Id.* at 761. The court stated:

> If the effective date were not "part of an agency statement" such that material alterations in that date would be subject to the rulemaking provisions of the APA, it would mean that an agency could guide a future rule through the rulemaking process, promulgate a final rule, and then effectively repeal it, simply by indefinitely postponing its operative date. The APA specifically provides that the repeal of a rule is rulemaking subject to rulemaking procedures. 5 U.S.C. § 551(5). Thus, a holding that EPA's action here was not a rule subject to the rulemaking procedure of the APA would create a

contradiction in the statute where there need be no contradiction: the statute would provide that the repeal of a rule requires a rulemaking proceeding, but the agency could (albeit indirectly) repeal a rule simply by eliminating (or indefinitely postponing) its effective date, thereby accomplishing without rulemaking something for which the statute requires a rulemaking proceeding. By treating the indefinite postponement of the effective date as a rule for APA purposes, it is possible to avoid such an anomalous result.

*Id.* at 762.

The *Natural Resources* court noted that a similar position was taken by this circuit in *Council of the Southern Mountains, Inc. v. Donovan,* 653 F.2d 573 (D.C.Cir.1981). In that case, the Department of Labor promulgated regulations "requiring coal operators to equip all miners with self-contained self-rescuers (SCSRs)" by December 21, 1980. *Id.* at 575. On December 5, 1980, however, the Secretary "deferred implementation of the regulations until June 21, 1981." *Id.* In response to petitioner's claim that this deferral amounted to rulemaking subject to the requirements of APA, the court stated:

> Section 553(b)(A) of the APA excepts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from the notice-and-comment requirement. Intervenor asserts that the December 5 order fell within this exception since it was an "interpretative rule." The Secretary's published notice, however, did not invoke § 553(b)(A) and Government counsel told this court at oral argument that the order deferring implementation of the SCSR regulations "would most likely be considered a substantive rule" since it "did affect the rights of the parties involved." We agree with the Government that the December 5 order was a substantive rule since, by deferring the requirement that coal operators supply life-saving equip-

Regional Administrators, and any State Director, *id.* at 51409, from calling in Part B applications under the § 6924 standards and

beginning this process. This decision effectively suspended the implementation of these standards.

ment to miners, it had " 'palpable effects' upon the regulated industry and the public in general." *National Helium Corp. v. Federal Energy Administration,* 569 F.2d 1137, 1146 (Em.App.1977).

653 F.2d at 580 n. 28. *See also Consumer Energy Council of America v. F.E.R.C.,* 673 F.2d 425 (D.C.Cir.1982) (revocation of regulation subject to notice and comment requirements under APA).

■ *Natural Resources* and *Council of the Southern Mountains* stand for the proposition that an agency action which has the effect of suspending a duly promulgated regulation is normally subject to APA rulemaking requirements. In keeping with these opinions, we hold that an agency decision which effectively suspends the implementation of important and duly promulgated standards for two classes of hazardous waste management facilities constitutes rulemaking subject to notice and comment requirements of 5 U.S.C. § 553.

Both EPA and the intervenors contend that the announcement of permit procedures was a statement of agency policy, not a substantive rule, and as such expressly exempted from the notice and comment requirements of APA.[27]

[T]he Administrator's decision to temporarily assign priority to processing permits for new and existing tanks, waste piles and container storage facilities and new surface storage impoundments and incinerators over processing permits for existing surface storage impoundments and incinerators is a statement of policy because it gives advance notice of how the agency will be running the permit program.... The existing regulations have not been altered by this permitting policy. These facilities are still required to submit a Part B permit application under 40 C.F.R. 122.22(a)(2) should EPA

or a state director initiate such a request. If EPA believes that in a particular case, it should call up a permit for a particular existing surface impoundment or incinerator, it can do so under the existing regulations. The Administrator's general policy not to call up permits for these two classes of facilities does not, in fact, bind the Administrator not to do so.

Brief for Administrator, at 33–34 (footnotes omitted); similarly, Brief for Intervenors and Appellees, at 11 n. 5.

While the agency's characterization of its action may provide "some indication of the nature of the announcement," *Regular Common Carrier Conference v. United States,* 628 F.2d 248, 251 (D.C.Cir.1980) (quoting *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 39 (D.C.Cir.1974)), an announcement is not necessarily a policy statement because the agency has so labeled it. *See Chamber of Commerce of United States v. O.S.H.A.,* 636 F.2d 464, 468 (D.C.Cir.1980). "[I]t is the substance of what the [agency] has purported to do and has done which is decisive." *Id.* (quoting *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942)). We find the substantive effect of EPA's announcement wholly inconsistent with the "statement of policy" label the agency would assign to it.

■ Any claim of exemption from APA rulemaking requirements "will be narrowly construed and only reluctantly countenanced." *American Federation of Government Emp. v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981) (quoting *State of New Jersey, Department of Environmental Protection v. E.P.A.,* 626 F.2d 1038, 1045 (D.C.Cir. 1980)). Scrutiny of a claimed exemption should be exacting where an agency seeks, as EPA does here, to "undo all it accom-

---

**27.** APA notice requirements do not apply:

(A) to interpretative rules, *general statements of policy,* or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure

thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b)(A), (B) (emphasis added); *see also* 5 U.S.C. § 553(d). Neither EPA nor EDF assert a "good cause" exception to the agency's action under §§ 553(b)(B) or 553(d)(3) and we accordingly do not consider it in this opinion.

plished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal." *Consumer Energy Council of America,* 673 F.2d at 446. The Third Circuit applied a like degree of scrutiny in *Natural Resources.*

In this case, the agency, without notice and the opportunity for comment, abrogated rules which had been proposed, which had undergone years of notice and comment procedures, and which had been promulgated, with an effective date, in final form. By postponing the effective date of the amendments, EPA reversed its course of action up to the postponement. That reversal itself constitutes a danger signal. Where the reversal was accomplished without notice and an opportunity for comment, and without any statement by EPA on the impact of that postponement on the statutory scheme pursuant to which the amendments had been promulgated, the reviewing court must scrutinize that action all the more closely to insure that the APA was not violated.

683 F.2d at 760–61 (footnote omitted).

■ Viewed under strict scrutiny, we cannot accept EPA's assertion that its decision not to call in Part B permits under § 6924 standards is exempt from APA notice and comment requirements as a "general policy" statement. The "policy" relieved owners and operators of all existing incinerators and storage impoundments from having to submit the Part B applications and thus from having to put their facilities in compliance with duly promulgated regulations. The substance of the decision was exemption of a whole class from prescribed obligations required by law for the protection of the public. *See American Bus Ass'n v. United States,* 627 F.2d 525 (D.C.Cir.1980) (ICC action lessening regulatory constraints upon motor carriers not a "general policy statement" exempt from APA notice and comment procedures where effect of pronouncement was determinative of issues or rights to which it was addressed).[28]

## V. CONCLUSION

In an effort to emphasize our exact holding, we summarize our views of this case:

Congress required EPA to promulgate regulations by a date specified. These regulations were required to contain standards for the storage and disposal of hazardous waste, designed to protect the health and safety of the public. The statute was constructed so that fulfillment of the standards would be achieved by requiring permits for operation of facilities. The permits would be obtained by applications showing compliance with the standards, and issuance of permits would follow satisfactory completion of the applications. The particular facilities involved in this case are surface impoundments and incinerators.

EPA belatedly promulgated the regulations under court order and provided therein, as required by Congress, that the regulations would become effective in six (6) months—July 1981. In Phase I of its promulgation program, EPA called for an initial portion of a permit application (Part A). Filing of Part A with respect to a facility existing November 19, 1980 would confer interim status on each applicant. The remainder of the application, which must

---

**28.** Professor Davis' discussion of the *American Bus* holding further supports the position that a substantive rule is distinguishable from a policy statement through examination of its actual effect.

The soundness of the *holding* in the American Bus case is almost obvious, because the ICC's pronouncement, as soon as made, rendered the 1975 restrictions ineffective. The pronouncement, without more, changed the effective law that applied to the carriers. Furthermore, the statement that carriers should "request immediate issuance of their certificates" implied, as the court said, that the issuance was to be automatic. *Because the pronouncement effectively changed the law applying to the carriers, it was a rule.* It was not a mere general statement of policy because, as the D.C. Circuit said in 1974, "A general statement of policy ... is not finally determinative of the issues or rights to which it is addressed." *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974).

K. Davis, Administrative Law Treatise § 7:5, at 168–69 (Supp.1982) (emphasis in original).

show fulfillment of the § 6924 standards, was designated Part B. Shortly before the July 1981 effective dates, EPA decided not to call in for processing the Part Bs of all existing storage impoundment and incinerator facilities. The decision was publicly announced thereafter.[29]

The effect of the decision was to postpone the compliance mechanisms as to an entire class of facilities, those incinerators and impoundments already in existence November 19, 1980. Although the decision was not expressed as a suspension of the regulations creating the standards, the effect was exactly that. We hold that this action was in substance the promulgation of a regulation reviewable in this court.[30]

Because of its substantive effect on the obligations of the owners of existing facilities and on the rights of the public, as prescribed by Congress, the decision as a rule, was not excepted from the requirement of notice and comment, and was invalid at least for the omission of notice and an opportunity for comment. The decision must be vacated. We need not, and do not, reach the further question whether even with notice and an opportunity for comment, EPA could lawfully have postponed the effective date of the regulations.

In No. 81–2295, the judgment is AFFIRMED. In No. 81–2025 and 81–2214, the twice announced decision of the Administrator is VACATED. No costs are allowed to either party in this court.

WILKEY, Circuit Judge, dissenting:

After oral argument before this court, EPA withdrew its policy of refusing to request permit applications from existing incinerators.[1] One month later the agency promulgated revised standards for surface impoundments and announced that it would immediately begin requesting permit applications from these facilities as well.[2] Since EDF's complaint focused on the legality of EPA's refusal to request permit applications for existing incinerators and surface storage impoundments, the allegedly illegal activity which EDF sought to enjoin has already abated. Thus, an order by this court will have no practical impact on the parties and the issue of mootness arises.

I conclude that it is unlikely that the EPA will once again unilaterally postpone the processing of permit applications and that the case should therefore be dismissed as moot. The majority does not agree. Accordingly, I dissent. The lack of consistent analysis in the cases decided by the lower federal courts leaves the resolution of this issue far from clear, however, hence I feel some obligation to set out my views in detail.

I. The Proper Standard

Under Article III of the United States Constitution, the jurisdiction of the federal courts is limited to those suits presenting a "case or controversy."[3] The doctrine of mootness has therefore been developed to aid the courts in determining when a suit which once presented a live dispute ceases to retain the requisite characteristic of a case or controversy.

However, despite the existence of numerous Supreme Court opinions on the subject,[4]

---

**29.** EPA's later decision in 1982 to promulgate new standards for existing impoundments and to begin processing Part Bs for both surface impoundments and incinerators do not make these proceedings moot because the type of decision challenged herein, affecting the interests of petitioner, is capable of repetition yet evading review.

**30.** We agree with the district court that EPA had fulfilled the district court's decree to promulgate performance standards by issuing the regulations in January 1981 and that EPA's later decision to suspend their effectiveness as to existing facilities was neither an evasion of

the decree nor a failure to perform a non-discretionary act on which a citizen's suit could be predicated.

**1.** 47 Fed.Reg. 27516 (1982).

**2.** *Id.* at 32274.

**3.** U.S. Const., art. III.

**4.** *See, e.g., City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61

the law with respect to mootness is not completely settled. Indeed, it is not always clear what standard a court should apply when determining whether a case is moot. Quoting the Supreme Court, this court has stated:

> two conditions ... must be satisfied if a federal court is to dismiss a case as moot. First, the court must conclude "with assurance that 'there is no reasonable expectation ...'" that the alleged violation will recur" ... second, ... it must be plain that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." [5]

Under this standard the *defendant* bears the burden of proof.[6] However, neither EDF nor EPA discuss this standard, relying instead on what they characterize as an "exception" to the mootness rule. According to the parties, this "exception" exists when two elements combine: "(1) The challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." [7] This "exception" was first recognized in *Southern Pacific Terminal Co. v. ICC*,[8] and is commonly referred to as the "capable of repetition, yet evading review" exception. This court in *Sholly v. NRC*, stated that it is the *plaintiff* who must show that the case comes within this exception.[9]

At first glance, the parties' arguments appear to be based on the following theoretical construction. Under *Davis* (n. 5 and n. 6, *supra*), a case is moot if the *defendant* shows that there is *no reasonable expectation that the alleged violation will recur* and that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. But under *Weinstein* (n. 4, *supra*), the case falls within the capable of repetition yet evading review "exception" if the *plaintiff* shows that there *is a reasonable expectation that this same complaining party will be subjected to the same action again* and that the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration.

This theoretical construction is somewhat confusing, however, because it requires the *defendant* to prove that there is *no* reasonable expectation that the alleged illegal activity will recur in order to establish that the case is moot and then it requires the *plaintiff* to prove that there *is* a reasonable expectation that the allegedly illegal activity will recur in order to bring the case within the exception. The defendant's ability to prove that the case is moot therefore seems to preclude the court from finding that it is within the exception. This confusion arises only because courts have not

L.Ed.2d 608 (1979); *County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *SEC v. Sloan,* 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978); *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *SEC v. Medical Committee for Human Rights,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *Liner v. Jafco, Inc.,* 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964); *United States v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

5. *Doe v. Harris,* 696 F.2d 109, 111 (D.C.Cir. 1982) (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)).

6. *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383; *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953).

7. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). *See also SEC v. Sloan,* 436 U.S. 103, 109–10, 98 S.Ct. 1702, 1707–08, 56 L.Ed.2d 148 (1978); *Gannett Co. v. DePasquale,* 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979).

8. 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

9. 651 F.2d 780, 785 (D.C.Cir.1980), *vacated and remanded* —— U.S. ——, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983).

always carefully explained when the two standards apply.

As exemplified by this case, mootness issues arise most often when circumstances change during the course of the litigation so that granting the requested relief will not serve any purpose. The changed circumstances are of three main types: (1) the *plaintiff* abandons the claim or settles the suit, (2) the *defendant* voluntarily abandons the allegedly illegal conduct, or (3) intervening events *beyond the control of either party* render relief impossible or unnecessary.[10] Mootness issues caused by the *plaintiff's* activities seldom present a problem.[11] However, the courts' failure expressly to distinguish between the latter two situations has led to the confusion noted above. That confusion can be remedied by examining how each standard applies to each situation.

The test articulated in *Davis* was developed for situations in which *the defendant voluntarily alters his conduct* (situation No. 2 above).[12] The "capable of repetition yet evading review" test, on the other hand, has generally been applied to situations in which intervening events *beyond the control of either party render relief impossible or unnecessary* (situation No. 3 above).[13] Viewed in that light, the capable of repetition yet evading review doctrine is *not an*

*exception* to the mootness doctrine,[14] but *a test used to determine whether a case is truly moot in certain circumstances—i.e.,* when intervening events beyond the control of either party render relief impossible or unnecessary. The *Davis* test is a test which aids the *same determination in different circumstances—i.e.,* when the defendant voluntarily abandons the allegedly illegal conduct. The two standards do not conflict, both are standards for mootness (neither is truly an "exception"), they simply apply in different situations.

Of course, the two tests share a common element—both require an inquiry into the likelihood that the plaintiff will again be subject to the allegedly illegal conduct. Indeed, this appears to be the main concern under both standards. However, it is important to articulate when each standard applies because there are also differences in the two standards, differences which reflect the different concerns which arise in the two situations.

First, the *Davis* test requires that the *defendant* prove that there is no reasonable expectation that the allegedly illegal activity will recur.[15] Under the "capable of repetition yet evading review" test, on the other hand, the *plaintiff* is required to show that there is a reasonable expectation that he

---

**10.** 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533 at 263 (1975).

**11.** *Id.*

**12.** *See City of Mesquite v. Aladdin's Castle Inc.,* 455 U.S. 283, 289 n. 10, 102 S.Ct. 1070, 1074 n. 10, 71 L.Ed.2d 152 (1982); *SEC v. Medical Committee for Human Rights,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *United States v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

**13.** *See Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *SEC v. Sloan,* 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**14.** The Supreme Court has referred to the capable of repetition yet evading review doctrine as

an "exception," *see, e.g., Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982), as have some commentators. *See, e.g.,* 6A J. Moore, Moore's Federal Practice ¶ 57.13 at 57–128 n. 11 (1983). However, the term "exception" is used only to explain that something which appears to be moot is in fact justiciable. To the extent that the mootness doctrine is grounded on constitutional limits on judicial power, *see DeFunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 1705–06, 40 L.Ed.2d 164 (1974); *SEC v. Medical Comm. for Human Rights,* 404 U.S. 403, 407, 92 S.Ct. 577, 580, 30 L.Ed.2d 560 (1972); *Liner v. Jafio, Inc.,* 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964), it cannot admit of any true exception.

**15.** *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383; *W.T. Grant,* 345 U.S. at 632–33, 73 S.Ct. at 897–98.

will be subject to the same action again.[16] Placing the burden on the defendant makes sense when the defendant has voluntarily altered his conduct (situation No. 2). On the other hand, it would be somewhat unfair to place that burden on the defendant in situation No. 3 because it is the plaintiff who is seeking relief and the defendant has done nothing to avoid it.

The other primary difference in the two tests—the nature of the second prong—similarly reflects differences in the two situations. Under the second prong of *Davis*, the defendant is required to show that the effects of his allegedly illegal activity have been "irrevocably eradicated,"[17] while under the second prong of the "capable of repetition yet evading review" test the court considers whether the challenged activity is in its duration too short to be fully litigated prior to its cessation or expiration.[18] The second prong of the *Davis* test makes sense in the context of situation No. 2 because without it a defendant could injure a plaintiff, cease the allegedly illegal activity when challenged, and avoid responsibility for any continuing injury. Similarly, the second prong of the "capable of repetition yet evading review" test makes sense in the context of situation No. 3. If the intervening events over which neither party has control will by their nature occur before judicial review is terminated, it then seems fair to hear the case at the present time. Applying the duration requirement to situation No. 2 does not make sense, however, because in that situation the *defendant* controls the duration of the challenged activity. If the duration requirement applied to situation No. 2, the defend-

ant could determine whether to moot the case.

In sum, there are two basic tests for determining mootness; neither is properly an "exception." Each test applies in a different set of circumstances.[19] Thus, when the question of mootness arises the court's first inquiry should be *why* the circumstances have changed. The answer to that question then determines who has the burden of proof on the mootness issue and what standard applies.

## II. APPLICATION OF THE PROPER STANDARD

Applying the approach outlined above, I note first that the allegedly illegal activity abated in the present case because EPA (the defendant) *voluntarily terminated* its policy of not requiring permit applications for existing incinerators and surface storage impoundments. Thus, the correct standard is the one articulated in *Davis*, not, as the parties argue, the capable of repetition yet evading review standard.

As noted earlier, under *Davis*, the case is moot if the defendant shows (1) that there is no reasonable expectation that the alleged violation will recur and (2) that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. I conclude that defendant has met this burden.

The determination of whether there is a reasonable expectation that the alleged violation will recur depends largely on how the alleged violation or the allegedly illegal activity is characterized. This is the point on which the majority and I most radically diverge. The majority accepts EDF's asser-

16. *Sholly,* 651 F.2d at 785; *see also Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 ("there must be a ... 'demonstrated probability' that the same controversy *will* recur.") (emphasis added).

17. *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383.

18. *Weinstein,* 423 U.S. at 149, 96 S.Ct. at 349. As phrased in *Weinstein,* the duration requirement is the first prong of the "capable of repetition yet evading" test. I refer to it as the second prong only because the other prong is similar in nature to the first prong of *Davis.*

19. In his dissent in *Powell v. McCormack,* 395 U.S. 486, 559, 89 S.Ct. 1944, 1984, 23 L.Ed.2d 491 (1969), Justice Stewart noted that different mootness tests apply in different circumstances, stating that *Concentrated Phosphate, W.T. Grant,* and similar cases had "no application to the present case [because] this case does not involve the 'voluntary abandonment of a practice.' Rather it became moot because of an event over which the respondents had no control...." *Id.* at 562, 89 S.Ct. at 1985 (Stewart, J., dissenting).

tion that the present suit is a challenge to EPA's power to "*suspend any* promulgated RCRA regulation."[20] I, on the other hand, conclude that the present suit is more narrowly focused. In my opinion, the issue presented is the legality of EPA's decision *not to process permit applications* for existing incinerators and surface storage impoundments.

The majority's characterization of the allegedly illegal activity is unacceptable to me primarily because *it assumes the issue being decided.* Under the majority's resolution of this case, the legality of EPA's actions *turns on whether its decision to defer the processing of permits* under section 6925 *was in reality a suspension* of the regulations it promulgated under section 6924. EDF claims that it is and that accordingly notice and comment should have been provided. EPA, on the other hand, claims that its deferral of the permitting process does not affect the validity of the regulations under section 6924 and that accordingly its decision was a general statement of policy for which notice and comment was not needed. Thus, *the majority's characterization* of the activity being challenged *decides the merits*—if EPA suspended the regulations, notice and comment probably was required.[21] *The real issue before the court is whether the deferral of the permit process suspended the regulations.* Thus, the allegedly illegal activity which EDF challenges is *the deferral of the permit process* which it *claims* is illegal because it effectively suspended the regulations. I would therefore limit our mootness consideration to whether there is a reasonable expectation that the EPA will again *defer the*

*permitting process.* I conclude that there is not.

The present case in this respect is very much like *Davis* in which the "unique circumstances" that caused the defendant to engage in the allegedly illegal activity in the first place "are no longer present, and are unlikely to recur."[22] EPA deferred processing permits for existing incinerators and storage surface impoundments because of its tremendous workload, which resulted from having to process nearly 15,000 permits at once *because new regulations had been promulgated for all facilities.* To further complicate the problem *the standards* under which the permits for existing surface storage impoundments were to be processed *were under review by the EPA.* It is unlikely that Congress will again pass a new statute requiring wholesale changes and that EPA would at the same time decide to reevaluate those standards immediately after they were promulgated, so it is unlikely that the EPA will again defer the processing of permits. Thus, the first prong of *Davis* is met.

The second *Davis* prong is, in my opinion, also met. Since EDF has not claimed that the challenged policy gave rise to any claim for damages, the EPA's decision to begin processing permits completely eliminated any harm that might have been caused by the prior policy. This case is not like *Doe v. Harris,*[23] in which the plaintiff alleged a *continuing* harm caused by the *threat* that the defendant would return to his earlier conduct.[24] The EDF complains only of the effect of the policy when it is in force. Thus, because the harm has been completely eradicated and because I believe that

---

**20.** Majority Opinion at 810 (emphasis added).

**21.** *See Natural Resources Defense Council v. EPA,* 683 F.2d 752 (3d Cir.1982); *Council of the Southern Mountains, Inc. v. Donovan,* 653 F.2d 573 (D.C.Cir.1981).

**22.** *Davis,* 440 U.S. at 632, 99 S.Ct. at 1383.

**23.** 696 F.2d 109 (D.C.Cir.1982).

**24.** In *Harris,* plaintiff challenged the Veterans Administration's decision to turn over his medical records, including psychiatric records, to the U.S. Attorney without giving him any no-

tice. The court held that the case was not moot despite the return of the records, in part because plaintiff alleged a continuing harm from the threat of a recurrence of the challenged conduct. The court relied on "a psychiatrist's affidavit that disclosure of a paranoid's records would inhibit treatment and hinder the patient's recovery." *Id.* at 112. Thus, the effects of the alleged violation would not be completely eradicated until the plaintiff was assured, through a court order, that no unauthorized disclosure would recur.

there is no reasonable expectation that the circumstances giving rise to this suit will recur, I would hold that the case is moot.