# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 20, 2022          Decided July 22, 2022

No. 20-5291

HUMANE SOCIETY OF THE UNITED STATES, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02458)

———

*Caroline A. Flynn* argued the cause for appellants. With her on the briefs were *Ralph E. Henry*, *L. Allison Herzog*, *Roman Martinez*, and *Julia A. Hatcher*.

*H. Thomas Byron III*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Sushma Soni*, Attorney.

Before: TATEL\*, MILLETT, and RAO, *Circuit Judges*.

———

\* Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion by *Circuit Judge* RAO.

TATEL, *Circuit Judge*: At the culmination of a five-month rulemaking, the Department of Agriculture announced a final rule designed to protect show horses from abuse. As required by the Federal Register Act, the agency transmitted the signed rule to the Office of the Federal Register, which made it available for public inspection. But on the day President Trump took the oath of office, his Chief of Staff directed executive agencies to withdraw all pending rules. The question in this case is whether an agency must provide notice and an opportunity for comment when withdrawing a rule that has been filed for public inspection but not yet published in the Federal Register. We hold that it must.

## I.

The rule at issue in this case marks the latest effort in a fifty-year campaign to end the "soring" of show horses. To sore a horse means to cut, burn, or otherwise inflict pain on its legs to alter its natural gait. This form of abuse became a common method to "create[] artificially" the "distinctive 'walk'" of Tennessee walking horses popular in exhibitions without laborious and expensive training. H.R. Rep. No. 91-1597, at 2 (1970).

In 1970, Congress enacted the Horse Protection Act to bar the showing or sale of any horse subjected to a "cruel or inhumane method or device" "for the purpose of affecting its gait." Pub. L. No. 91-540, § 2, 84 Stat. 1404. The statute sought both to ensure humane treatment of horses and to prevent unscrupulous trainers from "compet[ing] unfairly" with those who opted to train their horses rather than torment them.

*Id.* § 3. It directed the Secretary of Agriculture to conduct inspections as necessary to enforce these prohibitions. *Id.* § 5.

The 1970 Act did little to abate mistreatment. In particular, the "limited resources available to the Department of Agriculture" allowed it to inspect horses at only a handful of the several thousand exhibitions each year. H.R. Rep. No. 94-1174, at 5 (1976).

To bolster the Department's enforcement capabilities, Congress amended the Horse Protection Act in 1976, authorizing the agency to issue regulations for the appointment of private inspectors at horse exhibitions. Pub L. No. 94-360, § 5, 90 Stat. 915. Exercising this authority, the Department established a system of "designated qualified persons"— inspectors selected by management to inspect horses at their shows. Definition of Terms and Certification and Licensing of Designated Qualified Persons, 44 Fed. Reg. 1,558, 1,562–63 (Jan. 5, 1979). Program regulations permitted horse industry organizations, after obtaining agency certification, to license designated qualified persons without direct agency training or oversight. *Id.* at 1,563. By appointing a designated qualified person to inspect horses at an exhibition, the exhibition's management fulfilled its "responsib[ility] for identifying all horses that are sore." Prohibition Concerning Exhibitors of Horses, 44 Fed. Reg. 25,172, 25,182 (Apr. 27, 1979).

Placing horse industry groups in charge of inspections proved ineffective, and soring continued apace. In 2010, the Department of Agriculture's Office of the Inspector General published a report finding that the "current program for inspecting show horses for abuse is not adequate to ensure that these animals are not being sored." U.S. Department of Agriculture Office of the Inspector General, Audit Report 33601-2-KC, *Animal and Plant Health Inspection Service*

*Administration of the Horse Protection Program and the Slaughter Horse Transport Program* 10 (Sept. 2010). Because designated qualified persons were beholden to "the horse show organizers who employ[ed] them," they had "a direct conflict of interest with enforcing the law" and often overlooked violations. *Id.* at 10–11. The OIG report recommended that the Department abolish the designated-qualified-person system and "establish by regulation that inspectors will be independent, USDA-accredited veterinarians." *Id.* at 17.

Under increasing pressure following the OIG report, the Department published notice of a proposed rule under which it would assume direct control of inspector licensure and training consistent with the report's recommendations. Licensing of Designated Qualified Persons and Other Amendments, 81 Fed. Reg. 49,112 (July 26, 2016). The Department held five public hearings, extended the rule's comment period, and ultimately received over 130,000 written comments. *See* 81 Fed. Reg. 65,307 (Sept. 22, 2016).

On January 11, 2017, the Department posted on its website a signed final rule that substantially adhered to its initial proposal along with a press release announcing that it had "announced a final rule" that "will be publish[ed] in the Federal Register in the coming days." The rule provided that some of its provisions would become effective thirty days after publication while others would take effect the next year. The Department then transmitted the rule to the Office of the Federal Register (OFR) for publication. Following the internal processing required by OFR regulations, OFR scheduled the rule for publication and made it available for public inspection on January 19, 2017.

The next day, the newly inaugurated President's Chief of Staff issued a memorandum directing all executive agencies to

"immediately withdraw" "regulations that have been sent to the OFR but not published in the Federal Register." Regulatory Freeze Pending Review, 82 Fed. Reg. 8,346, 8,346 (Jan. 24, 2017). Pursuant to that directive, the Department withdrew the rule from publication and took no further action on the rulemaking.

The Humane Society filed suit along with four of its members challenging the rule's withdrawal. It principally claims that the Department unlawfully repealed the rule without notice and comment or the reasoned decisionmaking that the Administrative Procedure Act requires. The district court dismissed, agreeing with the government that a rule becomes final only upon Federal Register publication. *Humane Society of the United States v. Department of Agriculture*, 474 F. Supp. 3d 320, 330–31 (D.D.C. 2020). The district court also rejected the Humane Society's alternative argument that OFR violated its own regulations. Our review is de novo. *See Safari Club International v. Jewell*, 842 F.3d 1280, 1285 (D.C. Cir. 2016) (reviewing de novo questions of subject matter jurisdiction and failure to state a claim).

## II.

We can quickly dispense with the government's argument that the Humane Society and its members lack Article III standing to challenge the rule's withdrawal. "As the Supreme Court explained in *Lujan v. Defenders of Wildlife*, to establish constitutional standing, plaintiffs must satisfy three elements: (1) they must have suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) the injury must be 'fairly traceable to the challenged action of the defendant'; and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *NB ex rel. Peacock v.*

*District of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). An organization asserting standing on its own behalf must meet the same standard, demonstrating "'concrete and demonstrable injury to [its] activities[]'" beyond "'a mere setback to [its] abstract social interests.'" *PETA v. Department of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Equal Rights Center v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)).

The Humane Society and its members easily surmount this bar. Each alleges a concrete, pecuniary injury. In its complaint, the Humane Society alleges that, absent a more rigorous inspection regime, it must "redirect its limited time and resources away from existing horse protection work to identify, investigate, publicize and counteract continuing soring activities." S*ee id.* at 1094 (organization suffers injury in fact when "the agency's action or omission to act injured the organization's interest" and "the organization used its resources to counteract that harm" (cleaned up)). And the Humane Society's members allege precisely the competitive harm Congress sought to eliminate with the Horse Protection Act: unable to compete with trainers who sore their horses with impunity, the individual plaintiffs have abandoned equestrian activities including exhibition and commercial training. *See* 15 U.S.C. § 1822 ("The Congress finds and declares that . . . horses shown or exhibited which are sore, where such soreness improves the performance of such horse, compete unfairly with horses which are not sore."). "We repeatedly have held that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *Louisiana Energy & Power Authority v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998).

To plead traceability, a plaintiff seeking to enforce procedural rulemaking requirements must demonstrate only "a causal relationship between the final agency action and the alleged injuries." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). The Humane Society and its members have done just that by pointing to the OIG report, which found that agency licensure of inspectors consistent with the final rule "would generally improve [the agency's] ability to enforce the Horse Protection Act." OIG Report at 3. Facing pecuniary harm from the rule's withdrawal, the Humane Society and its members have standing to challenge it.

## III.

To foster public participation and facilitate reasoned decisionmaking, "the Administrative Procedure Act requires agencies to afford notice of a proposed rulemaking and an opportunity for public comment prior to a rule's promulgation, amendment, modification, or repeal." *American Hospital Association v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). Providing for notice and comment before repeal of a final rule "ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal." *Consumer Energy Council of America v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982).

As the government emphasizes, for the past three decades incoming presidential administrations have quietly withdrawn rules awaiting Federal Register publication without observing this procedural requirement. *See* Regulatory Freeze Pending Review, 82 Fed. Reg. 8,346 (Jan. 24, 2017); Regulatory Review, 74 Fed. Reg. 4,435 (Jan. 26, 2009); Regulatory Review Plan, 66 Fed. Reg. 7,702 (Jan. 24, 2001); Regulatory Review, 58 Fed. Reg. 6,074 (Jan. 25, 1993). In some cases,

agencies have withdrawn these rules during internal OFR processing without ever releasing them to the public; in others, as here, they have done so after making the rule available for public inspection as a final rule. The government contends, and the district court agreed, that only publishing a rule in the Federal Register triggers the APA's requirement to undertake notice and comment to repeal it. The Humane Society, for its part, contends that the rule here became final when OFR made it available for public inspection or even earlier when the Department of Agriculture posted it on its website. We must decide when a rule passes this regulatory point of no return.

## A.

We begin our analysis with the language of the APA. Except in limited circumstances not relevant to this case, the statute's rulemaking provision guarantees the public notice and an opportunity to participate in agency "rule making." 5 U.S.C. § 553. The statute defines "rule making" as an "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). It in turn defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Thus, once an agency makes a rule—that is, once it makes a statement prescribing law with future effect—the APA requires the agency to provide notice and an opportunity for comment before repealing it.

To assess the government's claim that only Federal Register publication creates a rule, we look to the statute that governs such publication. Enacted in 1935 and codified in 1968, the Federal Register Act mandates publication of presidential proclamations and agency regulations with general applicability and legal effect. Pub. L. No. 74-220, 49 Stat. 500; *see* Act of Oct. 22, 1968, Pub. L. No. 90-620, 82 Stat. 1238. As

amended, it requires agencies to transmit to OFR the original and copies of any document required to be published in the Federal Register. 44 U.S.C. § 1503. Under OFR's regulations, the document is then "held for confidential processing until it is filed for public inspection." 1 C.F.R. § 17.1. Then, OFR must make a copy "immediately available for public inspection in the Office" and "cause to be noted on the original and duplicate originals or certified copies of each document the day and hour of filing." 44 U.S.C. § 1503.

The Federal Register Act also sets forth the legal consequences of each step in this process. Making a document available for public inspection "is sufficient to give notice of the contents of the document to a person subject to or affected by it." 44 U.S.C. § 1507. A document "is not valid as against a person who has not had actual knowledge of it until . . . [it is] made available for public inspection." *Id.* Federal Register publication then "creates a rebuttable presumption" that the document was "duly issued, prescribed, or promulgated" and that it was properly "made available for public inspection at the day and hour stated in the printed notation." *Id.*

Far from bolstering the government's position, the Federal Register Act forecloses its argument that an agency prescribes a rule only once the rule is published in the Federal Register. The statute repeatedly distinguishes between the publication of a document and its issuance, prescription, or promulgation. For example, Federal Register publication only "rebuttabl[y]"— and not conclusively—establishes that a published document was duly prescribed. *Id.* In its provision governing transmittal of agency documents to OFR, the Federal Register Act also creates special procedures for when a document "is issued, prescribed, or promulgated outside the District of Columbia." 44 U.S.C. § 1503. Similarly, the statute defines a "document" transmitted by an agency to OFR to include "an order,

regulation, [or] rule" that has been "issued, prescribed, or promulgated by a[n] . . . agency." 44 U.S.C. § 1501. In other words, the statute contemplates that a rule may be prescribed *before* publication in the Federal Register.

Confronted with this language at oral argument, government counsel conceded that "a rule can be issued, prescribed, or promulgated without publication in the Federal Register or prior to publication in the Federal Register." Recording of Oral Arg. 1:06:28–1:07:21. Given this concession and the statute's plain language, it is difficult to see what of the government's statutory argument remains. The APA requires notice and comment before "repealing a rule." 5 U.S.C. §§ 551(5), 553. If an agency can prescribe a rule without publishing it, then publication cannot mark the point at which the requirement to undertake notice and comment before repeal attaches.

Rather than set the critical date at the date of publication, the Federal Register Act sets it at the date a rule is filed for public inspection. That is the "day and hour" the statute requires be noted for posterity. 44 U.S.C. § 1503. It is then that a rule becomes "valid" against the public at large. 44 U.S.C. § 1507. And it is filing a document for public inspection, not publication in the Federal Register, that the statute deems "sufficient to give [constructive] notice" of the document to affected parties. *Id.* Making a rule available for public inspection, then, provides notice to the public and carries legal consequences. By contrast, publication in the Federal Register serves an essentially evidentiary rather than legal function. It creates a "rebuttable presumption" that the published document is a "true copy" of one already "duly issued, prescribed, or promulgated" and that it "was filed with the Office of the Federal Register and made available for public inspection at the day and hour stated in the printed notation." *Id.*

11

Contemporaneous executive-branch opinions support this straightforward reading of the statute. An opinion by the Attorney General just three months after the Federal Register Act's enactment concluded that regulations are "valid and operate as constructive notice . . . as soon as they have been filed . . . and made available for public inspection[,] . . . and that publication in the Federal Register is not essential to their validity." Questions Arising in the National Archives Establishment Under the Federal Register Act, 38 U.S. Op. Att'y Gen. 359, 361 (1935). Indeed, the first regulations governing public inspection and publication under the Federal Register Act designated some agency documents of general applicability and legal effect to be made available for public inspection but not published. Federal Register Regulations, 3 Fed. Reg. 1,209, 1,221 (May 28, 1938) (requiring that Securities and Exchange Commission forms "shall be filed . . . for public inspection, but only a notation of the fact of filing shall be published in the Federal Register"). Several years after the statute's codification, the Office of Legal Counsel, echoing the Attorney General's decision decades before, wrote that "under the terms of the statute, it seems clear that filing with the Federal Register constitutes promulgation of a regulation even though publication may not occur until a later date." Federal Register Act—Date of 'Promulgation' of Law Enforcement Assistance Administration Regulations, 1 U.S. Op. O.L.C. 12 (1977). Although recent administrations have taken a different view when doing so served their interests, that view is unpersuasive considering the statutory text and history.

The government also relies on the Freedom of Information Act, which provides that a person may not "be adversely affected" by a rule wrongly withheld from publication "[e]xcept to the extent that a person has actual and timely notice of the terms thereof." 5 U.S.C. § 552(a). This qualified limitation on the government's enforcement authority has no

bearing on the Federal Register Act's more specific provisions that give legal effect to the date a rule is made available for public inspection. But in any case, both the Federal Register Act and FOIA contemplate prepublication enforcement against parties with actual notice, a proposition incompatible with the government's view that an agency prescribes law only by Federal Register publication. The government has repeatedly (and often successfully) invoked this authority in criminal prosecutions for violations of unpublished rules. *See, e.g.*, *United States v. Ventura-Melendez*, 321 F.3d 230, 233 (1st Cir. 2003) (affirming criminal conviction on the ground that defendant had actual notice of unpublished rule); *United States v. Bowers*, 920 F.2d 220, 222–23 (4th Cir. 1990) (same); *United States v. Mowat*, 582 F.2d 1194, 1201–03 (9th Cir. 1978) (same); *United States v. Aarons*, 310 F.2d 341, 348 (2d Cir. 1962) (same). The dissent seeks to minimize these cases because, in its view, they "involved something other than substantive rules." Dissenting Op. at 13. But the courts deciding them characterized the rules at issue as "'substantive rules of general applicability'" for which Federal Register publication was required. *Mowat*, 582 F.2d at 1199 (quoting 5 U.S.C. § 552(a)(1)(D)); *see also Aarons*, 310 F.2d at 347 ("There appears to be no basis for doubting that the Coast Guard's Special Notice is a 'rule' within the definition found in § 2(c) of the APA . . . .").

The government sees no contradiction between its claimed powers to enforce unpublished rules and to withdraw those rules without abiding the APA's procedural requirements. Instead, it contends that "the statutes give the agency the flexibility to enforce [a] rule[] without waiting for publication where (1) the agency treats an unpublished requirement as final and enforceable, and in fact attempts to enforce it, and (2) the subject of the enforcement action has actual knowledge of the unpublished rule." Appellees' Br. 48–49. This position—that

the enforceability of an unpublished rule turns solely on whether the government chooses to enforce it—does not comport with even the most impoverished notions of due process. Essentially, the government takes the view that a rule filed for public inspection and awaiting publication exists in a state of superposition like Schrödinger's cat—simultaneously law and not law until the agency publishes or withdraws it.

Nor do we have any trouble rejecting the government's argument that we should adopt one standard for immediately effective rules and a different standard for rules (like this one) with an effective date after publication. Most important, that distinction finds no support in the statute. The APA's definition of a rule includes legal prescriptions that carry only "future effect." 5 U.S.C. § 551(4). And under the Federal Register Act, making a document available for public inspection "give[s] notice of the contents of the document to a person subject to or affected by it" regardless of when the document becomes effective. 44 U.S.C. § 1507.

The government's proposed distinction based on a rule's effective date also contravenes our precedent. Like an enacted statute, which becomes "valid law" once enacted even if not yet "effective," *see United States v. Brundage*, 903 F.2d 837, 843 (D.C. Cir. 1990), a duly prescribed rule is law even if it sets a future effective date. And we have repeatedly held that "an order delaying [a] rule's effective date . . . [is] tantamount to amending or revoking a rule." *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (per curiam); *see, e.g.*, *Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 813, 816 (D.C. Cir. 1983) ("a suspension of the effective date of regulation . . . may be reviewed in the court of appeals as the promulgation of a regulation" and "is normally subject to APA rulemaking requirements"); *Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 582 (D.C. Cir. 1981) (per

curiam) (absent good cause an agency must "follow notice and comment procedures" to "postpone the implementation date" of a rule). Under these precedents, a rule becomes law when duly prescribed, not when it goes into effect.

**B.**

The dissent takes issue with our statutory analysis, contending that the APA's rulemaking provisions "strongly suggest" that publication marks the point at which an agency must undertake notice and comment to repeal a rule. Dissenting Op. at 6. Glossing over the APA's definitions of a "rule" and "rule making," the dissent rests its argument on the statute's requirement that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date." 5 U.S.C. § 553(d). In its view, the Federal Register Act is "obsolete," and this "later, more specific" language supersedes it. Dissenting Op. at 5 (first quote); *id.* at 11 (second quote).

We disagree. For one, the dissent's chronology is backwards. Although Congress first enacted the Federal Register Act in 1935, it codified the statute without substantial change in 1968, more than two decades after the APA's enactment and two years after its codification. *See* Act of Oct. 22, 1968, Pub. L. No. 90-620, 82 Stat. 1238 (codifying the Federal Register Act); Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946); Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378 (codifying the APA). Even more important, the APA's requirement that certain rules be published thirty days before their effective date says nothing about when those rules become rules. As explained above, longstanding precedent holds that once an agency prescribes a rule, it must provide notice and comment before repealing it, even if the rule's effective date has yet to pass. *See Clean Air*

*Council*, 862 F.3d at 6; *Environmental Defense Fund*, 713 F.2d at 813.

The dissent's reference to the Congressional Review Act is more puzzling. Like the APA, that statute requires some action (namely, a report to Congress) before the effective date of certain rules. *See* 5 U.S.C. § 801. And like the requirement that agencies publish certain rules thirty days before their effective date, the congressional reporting requirement has nothing to do with the question here: when an agency has prescribed a rule and thus must undertake notice and comment to repeal it. But unlike the APA's requirements, the congressional reporting requirement has nothing to do with publication either. The only significance of Federal Register publication under the Congressional Review Act is that a so-called major rule may take effect sixty days after the later of when Congress receives the required report or when "the rule is published in the Federal Register, if so published." 5 U.S.C. § 801(a)(3).

The dissent's argument suffers from still another defect: many rules are exempt from the APA's requirement that substantive rules be published thirty days before their effective date, including any rule that "relieves a restriction" or for which an agency finds "good cause" to avoid delay. 5 U.S.C. § 553(d). Thus, even for substantive rules, publication is not a hard-and-fast prerequisite for a rule to become effective. The Congressional Review Act, too, allows a rule to take effect immediately if the President determines that certain conditions are met or an agency finds "good cause." *See* 5 U.S.C. §§ 801(c)(1), 808.

Our dissenting colleague is "not aware" of any case in which an agency has invoked these exemptions to make a substantive rule effective before publication. Dissenting Op. at

13–14. But as recently as last year, the Centers for Disease Control and Prevention did just that in its order requiring face masks on public transportation. Citing the ongoing public health emergency, the CDC's order took effect February 1, 2021—the day it was filed for public inspection and two days before its Federal Register publication. Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs, 86 Fed. Reg. 8,025, 8,030 (Feb. 3, 2021); *see also Health Freedom Defense Fund, Inc. v. Biden*, No. 21-cv-1693, 2022 WL 1134138, at *12 (M.D. Fla. Apr. 18, 2022) (explaining that while the CDC initially claimed, in the alternative, that its order did not qualify as a rule, the government "abandoned" that position in litigation). Other agencies routinely prescribe rules with effective dates before publication, including substantive rules for which agencies must and do provide notice and an opportunity for comment. *See, e.g.*, 2022-2023 Annual Specifications and Management Measures for Pacific Sardine, 87 Fed. Reg. 39,384 (July 1, 2022) (seasonal fishing rule effective on date of public inspection following notice and comment); Pacific Halibut Fisheries Catch Sharing Plan, 87 Fed. Reg. 19,007 (Apr. 1, 2022) (same).

In a last-ditch effort, the dissent argues that we should find the statutory scheme ambiguous and defer to OFR's regulations. Those regulations, however, are entirely consistent with our opinion. They permit an agency to withdraw "[a] document that has been filed for public inspection with the Office of the Federal Register but not yet published" through a "timely letter, signed by a duly authorized representative of the agency." 1 C.F.R. § 18.13(a). But as the dissent observes, many types of documents are published in the Federal Register, not only rules requiring notice and comment to repeal, and many such documents may lawfully be withdrawn on the eve of publication. *See* Dissenting Op. at 10–11. OFR's regulations

on the form and timing of such withdrawal simply say nothing about whether the APA—a statute OFR lacks authority to administer—requires notice and comment before an agency does so. These regulations also provide, for example, that "[a] document may be accepted for filing for public inspection and publication if it is on bond or similar quality paper, legible, and free of adhesive or correction tape." 1 C.F.R. § 18.4(a). But it would be absurd to suggest that an agency therefore need not allow notice and comment so long as it transmits a rule to OFR on bond paper.

## C.

Finding nothing in the relevant statutes to commend the government's position, we turn to the government's argument that precedent compels it.

Only one of our cases has addressed when an agency must go through notice and comment to withdraw an unpublished rule. In *Kennecott Utah Copper Corp. v. Department of Interior*, we rejected a host of procedural and substantive challenges to natural resource damage assessment regulations. 88 F.3d 1191 (D.C. Cir. 1996) (per curiam). Among the many petitioners' many arguments, industry groups contended that the agency had unlawfully withdrawn a draft rule while the document underwent confidential OFR processing. *Id.* at 1205, 1207–09. Rejecting that argument, we explained that an agency does not prescribe a rule by "internally approv[ing] a draft version of the final regulations," meaning that the unpublished document "never became a rule subject to amendment or repeal." *Id.* at 1208–09. Unlike the rule here, the document in *Kennecott* was never made available for public inspection. *Id.* at 1201.

Notwithstanding *Kennecott*'s facts, the government and the dissent claim our statement that the agency merely

"rejected a document that had not yet been published" controls this case. *Id.* at 1208–09. This argument, however, seeks to elevate a single descriptive sentence to a major (apparently unreasoned) holding. Dissenting Op. at 3. In *Kennecott*, we did not purport to decide whether a rule that has been made available for public inspection requires notice and comment to repeal for a simple reason: the rule at issue had never been made available for public inspection. To the contrary, as we emphasized, the agency had only "internally approve[d]" the draft rule. *Id.* at 1208. Indeed, the parties in *Kennecott* never even briefed the significance of public inspection. As the Supreme Court has recently reminded us, "respect for past judgments also means respecting their limits." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022). We decline to read *Kennecott*, as the dissent would, to resolve an important statutory question "on the basis of a handful of sentences extracted from [a] decision[] that had no reason to pass on the argument." *Id.*

The dissent points to several of our decisions addressing when a rule becomes final for purposes of judicial review. Those decisions, however, dealt only with the meaning of "promulgation" in particular statutory review provisions, a question unrelated to when notice-and-comment requirements attach. In one case, for example, we "distinguished between 'issuance' and 'promulgation'" as those terms were used in an agency's organic statute "to determine the timeliness of a petition for review." *National Association of Manufacturers v. NLRB*, 717 F.3d 947, 953–54 (D.C. Cir. 2013) (quoting *National Grain & Feed Association v. OSHA*, 845 F.2d 345, 345 (1988) (per curiam)). In other contexts, we have defined promulgation to mean a date earlier than Federal Register publication. *See, e.g.*, *American Petroleum Institute v. Costle*, 609 F.2d 20, 22–24 (D.C. Cir. 1979) (per curiam) ("'the date of such promulgation' means the date that the rule is signed and

distributed to the press and public"); *see also National Association of Manufacturers*, 717 F.3d at 953–54 ("the time of filing with the Office of the Federal Register" is the appropriate date for "testing the validity of the Board's rule"); *Saturn Airways, Inc. v. Civil Aeronautics Board*, 476 F.2d 907, 909 (D.C. Cir. 1973) (per curiam) (concluding that an unpublished rule was ripe for review once an agency communicated its content to the public).

Looking outside our circuit, the government points to two immigration cases involving a withdrawn rule, but neither conflicts with the position we adopt here. The Second and Ninth Circuits concluded that a withdrawn rule "never became effective" because its effective date "was never filled in." *Zhang v. Slattery*, 55 F.3d 732, 749 (2d Cir. 1995); *accord Chen v. INS*, 95 F.3d 801, 805 (9th Cir. 1996). As government counsel conceded at oral argument, those cases did not decide when an agency must comply with the APA's procedural requirements in withdrawing a rule before publication. Recording of Oral Arg. 59:44–1:00:58.

Adopting the government's view that a rule requires notice and comment to repeal only once it is published in the Federal Register, however, would place us in conflict with one of our sister circuits. Reasoning that the "lack of formal publication does not preclude the effectiveness of an otherwise valid agency action," the Fifth Circuit has held that "after announcement of a rule," an agency must allow notice and comment if it chooses to "reconsider." *Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092, 1099–1100 (5th Cir. 1976). Thus, the only on-point out-of-circuit precedent comports with our interpretation of the APA.

**D.**

Confident that the statute so commands and unobstructed by precedent, we hold that agencies may repeal a rule made available for public inspection in the Office of the Federal Register only after complying with the APA's procedural requirements. The Department failed to do so when it withdrew its final rule without providing notice and an opportunity for comment or invoking a statutory exemption.

We take a moment now to emphasize the limits of our decision. Because the rule was final once OFR made it available for public inspection, we need not address the Humane Society's alternative argument that it passed this threshold even earlier when the Department posted the rule on its website. Nor do we have occasion to decide when APA procedures attach to rules not yet on public inspection but enforceable against those with actual notice. Finally, because the parties agree that success on the Humane Society's APA claim would give it all the relief it seeks, we decline to reach its alternative argument that OFR violated its regulations under the Federal Register Act.

Of course, we recognize that our decision may necessitate some changes in agency practice. For example, agencies may need to ensure typographical errors and any defects in form are corrected during internal OFR processing, rather than in the brief period between public inspection and publication. But that is as far as it goes. The dissent's hand-wringing about the remedy in this case has a simple answer: the case is like any other in which an agency repeals a rule without notice and comment and a court holds that it was wrong to do so. *See, e.g.*, *Environmental Defense Fund*, 713 F.2d at 818 (holding that an agency order that had the effect of repealing a prior rule "must be vacated" because it "was invalid . . . for the omission of

notice and an opportunity for comment"). The possibility of some logistical difficulties in no way undermines "the fundamental principle that the government must follow the law." *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 20 (D.C. Cir. 2022).

## IV.

The APA demands procedural regularity both when an agency formulates new law and when it repeals the old. Although political transitions may provide a sound basis for a change in policy, they do not relieve agencies of their procedural obligations. Because a rule made available for public inspection prescribes law with legal consequences for regulated parties, the APA requires the agency to undertake notice and comment before repealing it. We reverse the district court's order to the contrary and remand for further proceedings consistent with this opinion.

*So ordered.*

RAO, *Circuit Judge,* dissenting: Across administrations and for many decades, Executive Branch agencies have exercised their discretion to withdraw rules before publication in the Federal Register—sometimes due to a presidential transition, but also in the ordinary course of rulemaking. In this case, the United States Department of Agriculture ("USDA") withdrew a rule after it was made available for "public inspection" at the Office of the Federal Register, but before it was published. The majority holds that this withdrawal was the "repeal" of a rule requiring notice and comment procedures because the agency's rule was prescribed at the moment of public inspection. But we have never assessed a rule's finality or the end of the rulemaking process from public inspection at the regulatory printing press. To the contrary, publication determines the adoption, finality, and effectiveness of a substantive rule.

By cutting off agency discretion at public inspection—a mere ministerial moment on the way to publication—the majority imposes a judicial burden on agency procedures that conflicts with this circuit's precedent, the statutory framework for rulemaking, and a longstanding regulation permitting withdrawals prior to publication. I respectfully dissent.

I.

The timeline here is undisputed and detailed by the majority, but I provide a brief overview to situate USDA's withdrawal in the rulemaking process. Following a period of notice and comment, USDA completed a substantive rule to prevent the abusive practice of "soring" show horses.[1] USDA sent the rule to the Office of the Federal Register ("OFR"),

---

[1] USDA acted under its rulemaking authority delegated in the Horse Protection Act of 1970, Pub. L. No. 91-540, § 9, 84 Stat. 1404, 1405 (codified at 15 U.S.C. § 1828).

where it was made available for public inspection on January 19, 2017, and scheduled for publication on January 24.

On January 20, President Trump took office and that day instituted a regulatory freeze, requiring agencies to withdraw all rules that had been sent to OFR but not yet published. Regulatory Freeze Pending Review, 82 Fed. Reg. 8,346 (effective Jan. 20, 2017). On January 23, USDA informed OFR that it was withdrawing the horse soring rule, and OFR did not publish it.

The Humane Society sued, claiming USDA had unlawfully repealed a final rule without the notice and comment required by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 553. The Humane Society asked the district court to vacate USDA's withdrawal of the horse soring rule and compel publication in the Federal Register. The district court dismissed the suit. *Humane Soc'y of the U.S. v. USDA*, 474 F. Supp. 3d 320 (D.D.C. 2020). The court explained that USDA did not need notice and comment to withdraw the rule because it had not been published and because, under the relevant statutes and precedents, a rule is generally not a "finalized, legislative rule" until "publication in the Federal Register."[2] *Id.* at 330, 335.

## II.

The question in this case is when an agency's rulemaking discretion ends—the "point of no return," as the majority puts it. Maj. Op. 8.

---

[2] The court also rejected the Humane Society's claim that OFR was required by regulation to publish the rule on January 23, but failed to do so. *Id.* at 336–37.

Circuit precedent provides a ready answer to this question. USDA's withdrawal of the horse soring rule before publication was lawful. We have squarely held that an agency may modify or withdraw a rule at any point prior to publication in the Federal Register. In *Kennecott Utah Copper Corporation v. Department of the Interior*, we considered the status of a regulation that had been withdrawn from OFR prior to publication. 88 F.3d 1191, 1200–01 (D.C. Cir. 1996). Like the Humane Society, the *Kennecott* petitioners argued that the withdrawal was unlawful because the agency had failed to follow notice and comment procedures. *Id.* at 1207–08. We disagreed, explaining that those procedures are required only to formulate, amend, or repeal a rule, none of which described the agency's withdrawal before publication. *Id.* at 1208 (citing 5 U.S.C. §§ 551(5), 553(b)–(c)). Rather, the agency had merely "discard[ed]" and "rejected a document that *had not yet been published*" and therefore "*never became a rule* subject to amendment or repeal." *Id.* at 1209 (emphases added). Indeed, we referred to the withdrawn rule simply as a "document" because it was never published and therefore "never became a binding rule requiring repeal or modification." *See id.* at 1208. Discussing a related issue, we further explained that the agency's "decision to withdraw the document did not alter substantive legal obligations under previously published regulations," and therefore the withdrawal "did not constitute a 'regulation'" that would have required notice and comment procedures. *See id.*

It follows squarely from *Kennecott*'s holding and logic that USDA was entitled to withdraw its horse soring rule without notice and comment. Because the rule was never published in the Federal Register, it was never promulgated by USDA, never altered the substantive legal obligations of private parties, and never became a binding regulation requiring notice and comment to repeal. *Id.* at 1207–09.

4

The majority attempts to cabin *Kennecott* to its facts, emphasizing that the document in that case had been sent to OFR but had not been made available for public inspection. Maj. Op. 17–18. This is a distinction without a difference. In *Kennecott*, this court did not rely on public inspection, but instead drew a sharp line between documents sent to OFR on the one hand, and "binding" regulations published in the Federal Register on the other. *See Kennecott*, 88 F.3d at 1208. We explained that before publication, a document sent to OFR could not be considered a "binding rule" because if it were, then "whenever agencies propose rules, receive comments from the public, and internally approve a draft version of the final regulations, the APA would prevent agencies from discarding those documents without again requesting public comment." *Id.* What made the document a "binding rule requiring repeal" was publication in the Federal Register. *Id.*

It was thus necessary to our decision that a substantive rule could be withdrawn without notice and comment if it was "not yet … published" in the Federal Register. *See id.* at 1208–09. This "ratio decidendi" carries "the force of law." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1404 & n.54 (2020) (cleaned up); *see also Citizens for Responsibility and Ethics in Wash. v. Dep't of Justice*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (rejecting attempts to cabin *Kennecott* to its facts, instead following its "necessar[y]" and "essential" reasoning in the Freedom of Information Act context). Although USDA's horse soring rule was one step closer to publication than the rule in *Kennecott*, that fact is irrelevant under *Kennecott*'s reasoning. "[W]e are not at liberty to rewrite circuit precedent in the way [the majority] desires" through a stinting reading of precedent. *See Ali v. Trump*, 959 F.3d 364, 372 (D.C. Cir. 2020).

USDA's rule never made it to the finish line. Under *Kennecott*, the withdrawal before publication in the Federal Register did not require notice and comment procedures.

## III.

Even if we were writing on a clean slate, the relevant statutes and a longstanding regulation give agencies discretion to withdraw substantive rules at any point before publication in the Federal Register without notice and comment. Latching onto a provision in the Federal Register Act that is obsolete with respect to substantive rules, the majority picks public inspection as the point of no return. Rather than rely on the generic requirements governing our regulatory printing press, I would look to statutes that govern the rulemaking process and the established judicial precedent setting the finality of agency action at publication. Because a rule is adopted and final at publication, agencies retain discretion to modify or to withdraw rules until that point. At most, the relevant statutes are silent on this question, and a longstanding regulation reasonably fills that gap, permitting agencies to withdraw regulations until publication.

## A.

Rules and rulemaking come in many different species and subspecies, and the majority's arguments depend on glossing over distinctions between substantive rules of general applicability, such as USDA's rule, and other administrative actions. The APA broadly defines a "rule" to include "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). "Rules" also include descriptions of agency "organization, procedure, or practice," and the approval of rates and wages. *Id.* "Rule making" is defined simply as the "agency process for formulating, amending, or

repealing a rule." *Id.* § 551(5). Contrary to the majority's assertions, these basic definitions say nothing about when the rulemaking process ends for substantive rules of general applicability.

The specific statutory requirements for substantive rules are more germane to the question at hand and strongly suggest that publication is the point at which an agency no longer has discretion to withdraw or to modify a rule. These provisions state that "[s]ubstantive rules of general applicability adopted" by an agency must be "publish[ed] in the Federal Register." 5 U.S.C. § 552(a)(1)(D). Such rules cannot have legal effect against the general public until publication. *See id.* § 552(a)(1) ("[A] person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."). Moreover, the APA specifically requires, subject to certain exceptions not applicable here, that "[t]he required publication … of a substantive rule shall be made not less than 30 days before its effective date." *Id.* § 553(d). While the APA provides exceptions to notice and comment and to the delayed effective date requirement, there is no exception for the requirement that substantive rules must be published in the Federal Register. *Compare id.* § 553(a), (b)(A)–(B), (d)(1)–(3), *with id.* § 552(a)(1)(D). Taken together, these provisions place significant weight on publication for marking the adoption, finality, and eventual effectiveness of a rule. The APA provides no other benchmark for the end of the rulemaking process. It logically follows that, absent any other statutory or regulatory provision, an agency's rulemaking discretion continues up until the point of publication.

In a variety of contexts, we have reaffirmed this common-sense conclusion that publication is the moment a substantive rule is promulgated and becomes final agency action.

For instance, the filing window for seeking judicial review of agency action often commences from the time an agency promulgates or prescribes a rule. *See, e.g.*, 15 U.S.C. § 78y(b)(1) (allowing judicial review of Securities and Exchange Commission rules within 60 days of "promulgation"). We have consistently held that such filing windows begin to run upon publication because "'promulgation' is accorded its ordinary meaning—i.e., publication in the Federal Register." *Horsehead Res. Dev. Co. v. EPA*, 130 F.3d 1090, 1093 (D.C. Cir. 1997) (cleaned up); *see also, e.g.*, *Nat'l Grain & Feed Ass'n v. OSHA*, 845 F.2d 345, 346 (D.C. Cir. 1988) (per curiam) ("Based on the plain meaning of [a filing window statute], the ordinary usage of the term promulgate, and the lack of any specific agency regulation defining the date of promulgation, we conclude that [a rule] is promulgated on the date that it is published in the Federal Register.").

Similarly, courts may review only "final agency action." 5 U.S.C. § 704. No one questions that publication of a substantive rule constitutes the "consummation of the agency's decisionmaking process." *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). For the purposes of exercising judicial review, we have consistently understood publication in the Federal Register as the relevant moment a substantive rule becomes final agency action. *See, e.g.*, *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (explaining "publication" of regulations constituted "final agency action subject to judicial review"); *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (finding a rule "published in the Federal Register … was the culmination" of an agency's rulemaking process); *Nat. Res. Def. Council v. EPA*, 706 F.3d 428, 433 (D.C. Cir. 2013) (holding the EPA "consummated the decisionmaking process … only when it published its final views"); *Pub. Citizen Health Rsch. Grp. v. Comm'r, FDA*, 740

F.2d 21, 33 (D.C. Cir. 1984) (finding a rule insufficiently final because, among other things, it "had not been published" and "further administrative proceedings [were] contemplated"). Our focus has always been on when the rulemaking process has ended "to prevent premature judicial intervention in the administrative process." *Pub. Citizen*, 740 F.2d at 30.[3]

In other contexts, this court and our sister circuits have recognized that publication is the point at which a regulation is final and legally binding and therefore marks the end of an agency's rulemaking process. *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009) ("Agencies must publish substantive rules in the Federal Register to give them effect" as "[a]n unpublished final rule … can have no legal consequences."); *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 68

---

[3] The majority cites a few cases purporting to hold that promulgation can "mean a date earlier than Federal Register publication." Maj. Op. 18–19. But these cases either decline to address the question of when a rule is "promulgated" or arise in specific statutory contexts unrelated to the finality of agency discretion over substantive rules. In *National Association of Manufacturers v. NLRB*, we considered the question of an agency's rulemaking authority after losing a quorum and said we "need not determine when the Board's rule was 'promulgated.'" 717 F.3d 947, 954 (D.C. Cir. 2013). In *American Petroleum Institute v. Costle*, we analyzed the "context and purpose" of a specific statutory provision to conclude an agency could not add to the administrative record after public release of a rule. 609 F.2d 20, 22–24 (D.C. Cir. 1979) (per curiam). And in *Saturn Airways, Inc. v. Civil Aeronautics Board*, we made no mention of "promulgation," but interpreted a statute specifying the consolidation of judicial proceedings against the agency's order. 476 F.2d 907 (D.C. Cir. 1973). None of these cases suggest the end of agency rulemaking discretion at a point before publication; nor does the majority explain how these few examples weigh against the countless decisions setting the finality of substantive rulemaking at publication.

(D.C. Cir. 2000) (per curiam) (noting that "publication or lack thereof in the Federal Register" is helpful when "determining whether an agency has taken final action"); *see also, e.g.*, *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 106 (2d Cir. 2018) ("It is a basic tenet of administrative law, set out by the APA, that a substantive regulation does not have legal effect—that is, it has not been established authoritatively—until it has been published in the Federal Register. In other words, a regulation is not prescribed until it has legal effect, and it does not have legal effect until it is published in the Federal Register.") (cleaned up); *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1072 (9th Cir. 2010) (per curiam) (explaining the agency "did not intend to announce substantive rules" in part because agency policies "were not published in the Federal Register").

We have also frequently observed that agencies retain discretion over the substance and timing of a regulation until it is published (consistent, of course, with any specific statutory requirements). As part of this discretion, regulatory proposals sometimes "die[] on the vine." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021). We have rejected calls to micromanage an agency's regulatory agenda by forcing it to move forward with any particular regulatory proposal.[4]

---

[4] *See, e.g.*, *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1432 (D.C. Cir. 1996) ("An agency is free to adjust or abandon its proposals in light of public comments or internal agency reconsideration without having to start another round of rulemaking.") (cleaned up); *WildEarth Guardians v. EPA*, 751 F.3d 649, 651 (D.C. Cir. 2014) ("An agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities, which means that [an agency] has discretion to determine the timing and priorities of its regulatory agenda.") (cleaned up).

Until publication, the agency retains policymaking discretion over whether, when, and in what form to finalize a rule.

The APA's requirements and the decisions interpreting them reinforce a fundamental principle of administration law: publication is the time at which agency discretion ends and a substantive rule becomes final.

B.

The majority fails to grapple with these statutory requirements and longstanding judicial interpretations of the APA that index a rule's finality and promulgation to the time of publication. Instead, the majority relies on a provision in the 1935 Federal Register Act, concluding that a rule is "prescribed" upon public inspection and therefore cannot be modified or withdrawn after that point. Maj. Op. 9–10. But the Federal Register Act is not about rulemaking. It addresses the nuts and bolts of publication in the Federal Register, including matters such as the custody and printing of federal documents, how documents are filed, the distribution and price of the Federal Register, and which documents must be published. 44 U.S.C. §§ 1502–1505.

Nonetheless, the majority's entire analysis turns on Section 7 of the Federal Register Act. *See* Pub. L. No. 74-220, § 7, 49 Stat. 500, 502 (1935) (codified as amended at 44 U.S.C. § 1507). This provision states that a "document" (which is defined to include, but is not limited to, agency rules) "is not valid as against a person who has not had actual knowledge of it until" it is "made available for public inspection." 44 U.S.C. § 1507. Section 7 also says that public inspection is "sufficient to give notice of the contents of the document to a person subject to or affected by it." *Id.* The majority relies on this provision to conclude that public inspection is the end of an agency's rulemaking process because "public

inspection … provides notice to the public and carries legal consequences." Maj. Op. 10. In other words, the majority finds that because some *documents* might be legally effective upon public inspection, *substantive rules* must be binding and final upon public inspection and therefore require notice and comment to repeal. No "legal consequences" attach upon public inspection of substantive rules because later, more specific statutes supersede Section 7.

Whatever Section 7's application to other regulatory documents appearing in the Federal Register, this provision simply does not and cannot apply to substantive rules like the one USDA withdrew. Section 7 is limited by the APA's more specific provision that substantive rules cannot have legal effect until at least 30 days *after* publication. 5 U.S.C. § 553(d). This APA provision directly contravenes Section 7 because, at least for substantive rules, notice at public inspection is no longer sufficient for effectiveness. That this consequence followed from the plain meaning of the APA was understood at the time of its enactment. *See* ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 36 (1947) (explaining that the delayed effective date provision, now codified at 5 U.S.C. § 553(d), may be interpreted as amending Section 7 of the Federal Register Act).[5]

---

[5] It is puzzling that the majority suggests the 1968 *codification* of the 1935 Federal Register Act means that it somehow postdates the APA, which was enacted in 1946 and codified in 1966. Maj. Op. 14–15. Codification is purely ministerial and does not alter the substance of enacted legislation, as the majority recognizes. Nothing in the timing of codification changes the fact that the APA is the more recent and more specific statute with respect to rulemaking. The majority's reliance on the 1935 Attorney General opinion similarly fails to account for the Attorney General's reconciliation of the APA and the Federal Register Act in 1947. *See* Maj. Op. 11.

12

The majority also disregards the 1996 Congressional Review Act, which generally prevents "major rules" from taking effect until after submission to Congress and publication. Pub. L. No. 104-121, § 251, 110 Stat. 847, 868–69 (codified at 5 U.S.C. § 801(a)(1)(A), (a)(3)(A)). All other non-major rules similarly cannot take effect until "after submission to Congress" and "as otherwise provided by law," which includes publication. 5 U.S.C. § 801(4); *see also id.* § 553(d). These provisions also apply "notwithstanding any other provision of law." *Id.* § 806(a). This further indicates that finality and the legal effectiveness of substantive rules are marked from publication. The majority's reading of Section 7 of the Federal Register Act to conclude that substantive rules can become effective at public inspection cannot be squared with these provisions. The APA and the Congressional Review Act are later enacted and more specific statutes governing the rulemaking process that supersede anything to the contrary in Section 7.

At bottom, the majority fails to recognize any distinction among the types of documents required to be published in the Federal Register. Unlike substantive rules, some of these documents are fairly prosaic and do not impact the private rights of individuals. Public inspection may suffice for certain types of "documents" to give them legal effect; but it cannot suffice for the validity and enforcement of substantive rules.

The majority also relies on a dubious claim that the Federal Register Act and the Freedom of Information Act allow "prepublication enforcement against parties with actual notice." Maj. Op. 12. This claim also cannot apply to substantive rules of general applicability like the one at issue here. The majority overstates the government's position that in "very rare" cases there could be prepublication enforcement of

substantive rules.[6] The cases cited by the Humane Society and the majority for this proposition do not involve generally applicable substantive rules affecting private rights. Actual notice has mattered only for the enforcement of government actions that either involved something other than substantive rules, such as military notices and internal agency procedures and forms, or rules that did not require notice and comment to promulgate.[7] These cases involve different species of administrative actions falling within various exceptions to rulemaking procedures, and therefore are not relevant to the question in this case.

Neither the parties nor the majority cite any case, and I am not aware of any, in which actual notice was sufficient for

---

[6] The majority says the government conceded that rules could be enforced before publication. Maj. Op. 10. At oral argument however, the government stated only that rules made effective immediately could be enforced before publication and only in "very rare" circumstances. Oral Arg. Tr. 36:17–19; *see also id.* at 44:2–10, 44:23–45:2. USDA's rule had a delayed effective date, and the government made no suggestion that in the ordinary course substantive rules could be enforced before publication.

[7] The cases cited by the majority are thus inapposite to the question presented in this case. *See United States v. Ventura-Melendez*, 321 F.3d 230, 232–33 (1st Cir. 2003) (unpublished temporary security zone designation falling within the "military or foreign affairs function" exception to notice and comment rulemaking); *United States v. Bowers*, 920 F.2d 220, 222 (4th Cir. 1990) (unpublished income tax forms and non-updated publications of Internal Revenue Service organizational structures); *United States v. Mowat*, 582 F.2d 1194, 1201–03 (9th Cir. 1978) (unpublished instruction governing entry onto a military-owned island issued without notice and comment); *United States v. Aarons*, 310 F.2d 341, 342–43, 347–48 (2d Cir. 1962) (unpublished letter forbidding civilians from boarding military submarines without notice and comment).

prepublication enforcement of a substantive rule of general applicability. This is wholly unsurprising because substantive rules that impose regulatory burdens cannot be effective until at least 30 days after publication, foreclosing the government from enforcing them before publication even if affected parties had notice. The majority cites to regulations issued under the "good cause" exceptions to notice and comment and delayed effective date requirements. Maj. Op. 16; *see also* 5 U.S.C. § 553(d)(3). But these exceptions are not at issue in this case and do not apply to the mine run of regulations. Nor should the availability of such exceptions limit the scope of agency discretion for ordinary substantive rules. The majority mixes up these administrative cats and dogs.

Section 7 of the Federal Register Act must be read in light of the more specific and recent statutes that directly govern rulemaking, publication, finality, and the effective dates for substantive rules, as well as the decisions interpreting those provisions. The majority imposes public inspection as the judicial point of no return for regulatory decisionmaking. But it makes no sense to cut off agency discretion at public inspection, a point in time that has no legal relevance for generally applicable substantive rules. Courts have long understood publication as the time a rule is promulgated and final. An agency may therefore modify or withdraw a substantive rule up until the point of publication.

C.

While the best reading of the relevant statutes is that agency discretion continues until publication, a regulation implementing the Federal Register Act also explicitly allows for the prepublication withdrawal of rules, recognizing that

agencies have discretion to alter rules until that point.[8] 1 C.F.R. § 18.13(a). The majority's holding—that USDA could not withdraw its rule after public inspection—effectively invalidates this regulation *sub silentio*.

But the withdrawal regulation is a reasonable interpretation of the Federal Register Act and should be upheld. The regulation provides that agencies may withdraw rules "that ha[ve] been filed for public inspection … but not yet published" through a "timely letter, signed by a duly authorized representative of the agency." *Id.* This regulation, or one substantially similar, has been in place since 1972. *See* 1 C.F.R. § 18.13 (1973). In *Kennecott*, we explicitly recognized that the Federal Register Act "says nothing about the OFR's power to review or return documents" after filing or before public inspection and that there was no indication that Congress had "considered the details of the OFR's role in processing documents, including its authority to return documents to the issuing agency before they are made public." 88 F.3d at 1206.

Finding the statute silent on this question, we proceeded to consider the reasonableness of OFR's Document Drafting Handbook, which permits withdrawal prior to public inspection. In concluding that this policy choice was reasonable, we explained that "[a]llowing agencies to withdraw documents during the relatively brief processing period is consistent with the statute's purposes—establishing an orderly process for filing and publishing government regulations." *Id.* "By permitting agencies to correct mistakes and even to

---

[8] Regulations implementing the Federal Register Act are promulgated by the Administrative Committee of the Federal Register, which is comprised of the Archivist of the United States, the Director of OFR, and other Executive Branch officials. 44 U.S.C. § 1506(a).

withdraw regulations until virtually the last minute before public release," OFR ensures that regulations "are as correct as possible in both form and substance." *Id.* Allowing such withdrawals at the agency's discretion "avoids the needless expense and effort of amending regulations through the public comment process when those corrections could have been made more easily before … publication." *Id.*

Following *Kennecott*'s logic, the withdrawal regulation in this case is also reasonable. Withdrawal until publication serves the same purposes as allowing withdrawal before public inspection. Namely, it gives agencies the flexibility to correct errors or to take a different approach. Although nearly all rules will go straight from public inspection to publication in the Federal Register, the withdrawal regulation allows agencies to exercise their discretion until publication. This is a reasonable policy choice in the face of the Federal Register Act's silence on the question of withdrawal. Moreover, for substantive rules of general applicability, the withdrawal regulation coheres with the APA and the many precedents cited above that treat publication as the point at which agency action is final and agency discretion ends.

Because the longstanding withdrawal regulation is reasonable, this court has no authority to supplant it with a contrary rule of its own creation. The majority declines to address the reasonableness of the regulation or explain why in the face of the regulation this court may impose *additional* requirements on the withdrawal of rules awaiting publication. Maj. Op. 16–17. It is a "very basic tenet of administrative law" that courts cannot impose additional procedural requirements on agencies because "agencies should be free to fashion their own rules of procedure." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 544 (1978). The Supreme Court has held there was "little doubt that Congress

intended that the discretion of the *agencies* and not that of the courts be exercised in determining when extra procedural devices should be employed."[9] *Id.* at 546. Nonetheless, the majority imposes a previously unknown procedural requirement on every federal agency by prohibiting the modification or withdrawal of rules after public inspection despite the fact that not a single law or regulation requires this result.[10]

## V.

Finally, the majority fails to grapple with the implications of its decision, brushing off the "possibility of some logistical difficulty." Maj. Op. 21. Yet the court's decision contravenes congressional directives, longstanding Executive Branch practice, and settled judicial precedents. Such unwarranted

---

[9] Applying the principles of *Vermont Yankee*, the Supreme Court and this court have consistently rebuffed the judicial imposition of administrative procedures. *See, e.g.*, *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021) (rejecting a credibility presumption because "[n]othing in the [statute] contemplates anything like the embellishment the Ninth Circuit ha[d] adopted"); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (rejecting this court's imposition of notice and comment procedures on interpretive rules); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1042 (D.C. Cir. 2012) (explaining courts cannot force agencies to comply "with a procedural requirement … clearly exclude[d] from [judicial] purview" pursuant to *Vermont Yankee*).

[10] I would also affirm the district court's dismissal of the Humane Society's claim against OFR for allegedly miscalculating the publication date of USDA's rule. At a minimum, the Humane Society's complaint did not allege that OFR's regular processing schedule applied, and so it failed to adequately allege that OFR had to publish USDA's rule on any specific date. *See* 1 C.F.R. §§ 17.2(b), 17.7.

judicial intervention will invariably lead to numerous disruptions for both agencies and courts.

To begin with, the majority imposes a new endpoint for agency discretion, but says nothing about the remedy the district court should apply in this case. If USDA unlawfully withdrew its horse soring rule in 2017, what happens next? Does the district court have authority to compel USDA to resubmit its 2017 rule to the Federal Register?[11] Most of the rule had an effective date of January 1, 2018. If the 2017 rule is published, may USDA enforce the rule against private parties stretching back to the original effective date? If not the original effective date, what should be the new date? May the district court set the new date? Does the court have the authority to order USDA to amend its rule to change the effective date? Would USDA need to undergo notice and comment to change the effective date? *See Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (per curiam). Because we have not previously been in the business of reinstating rules withdrawn by Executive Branch agencies, these questions have no ready answers.

The remedy question matters because USDA's horse soring rule is hardly the only rule withdrawn after public inspection but before publication in the Federal Register. Numerous rules were withdrawn after public inspection during the 2017 presidential transition and during the most recent transition in 2021. Such withdrawals have occurred at presidential transitions stretching back at least to the Clinton Administration, and also occasionally at other times. *See* Jack M. Beerman, *Midnight Rules: A Reform Agenda*, 2 MICH. J.

---

[11] It is unclear what became of the rule after USDA withdrew it. The record is silent on whether OFR still retains a copy that it could publish if ordered to do so.

ENVT. & ADMIN. L. 285, 335–37 (2013); *see also* Maj. Op. 7–8 (recognizing this practice). Under the majority's decision, all these rules were withdrawn unlawfully. Can they rise from the regulatory graveyard as soon as an aggrieved party brings suit?

The decision today also undermines political accountability. This horse soring rule, sent to OFR by President Obama's USDA, was withdrawn at the direction of President Trump. As this litigation has proceeded, President Biden assumed office, and his USDA has determined that it does not agree with the 2017 rule and has said it will begin a new and improved rulemaking to address horse abuse. *See generally* Withdrawal of Proposed Rule, 86 Fed. Reg. 70,755 (Dec. 13, 2021). The majority's decision today means that a rule that never took effect may be resurrected (somehow) after more than five years and despite two intervening presidential elections. This interferes with the current president's authority to control the regulatory agenda of his administration. No matter that the people have spoken twice—this court has decided that we will have a horse soring policy from the past.

In addition to undermining Executive Branch accountability, it is unclear what the consequences of the majority's decision are for the timing of judicial review. If a rule is prescribed at the time that it appears for public inspection, do tolling periods now also run from public inspection? Is public inspection now the point at which a substantive rule is final for purposes of judicial review? The majority's decision could create confusion for settled filing windows and potentially close the courthouse doors to those who do not regularly check the public inspection desk of the Federal Register. And the majority's reasoning about "actual notice" does not foreclose future litigation about even earlier dates at which an agency's rulemaking discretion might end. In this case the Humane Society pressed that the rule was final

when posted to USDA's website. Could an agency withdraw a rule after such posting? The majority declines to say. *See* Maj. Op. 20. What of an announcement in an agency press release? Publication in a pamphlet? Agencies and the regulated public must stay tuned for future decisions of this court.

Finally, the majority's decision has disturbing implications for due process in agency enforcement. The majority reasons that substantive rules of general applicability can be effective at some point before publication, and that an agency can enforce a rule against a private party with simple notice of the rule. But prepublication enforcement of substantive rules is inconsistent with the APA, and the government does not seriously contend otherwise. The majority's insistence on the availability of prepublication enforcement endorses an expansive understanding of agency power, which, if actually exercised, would raise serious due process concerns for individuals targeted by regulatory agencies.

\* \* \*

An agency's ability to modify or to withdraw a regulation now ends at the public inspection desk of the Federal Register. By requiring USDA to undergo notice and comment procedures to withdraw an unpublished substantive rule, the majority upends longstanding Executive Branch practice and the fundamental principle, grounded in statute, precedent, and regulation, that publication in the Federal Register marks the end of an agency's rulemaking process. Because the majority's decision cannot be reconciled with our law, I dissent.